ROSMAN & GERMAIN LLP
Daniel L. Germain (Bar No. 143334)
Germain@Lalawyer.com
16311 Ventura Blvd., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

*Attorneys for Plaintiffs and the Proposed Classes*

*[additional counsel on signature page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES HEIMAN and MISTY ALEXANDER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>         v.<br><br>WELLS FARGO & COMPANY, a Delaware Corporation; WELLS FARGO BANK, N.A., d/b/a Wells Fargo Dealer Services, Inc., a South Dakota Corporation; BALBOA INSURANCE COMPANY, a California Corporation; NATIONAL GENERAL INSURANCE COMPANY (individually and as successor-in-interest to Balboa Insurance Company), a North Carolina Corporation; DAWN MARTIN HARP; BILL KATAFIAS; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | **Case No. 8:17-cv-01395**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

– 1 –

CLASS ACTION COMPLAINT

1.     Plaintiffs Charles Heiman and Misty Alexander (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Wells Fargo & Company ("Wells Fargo"), Wells Fargo Bank, N.A., doing business as Wells Fargo Dealer Services, Inc. ("Wells Fargo Bank"), Balboa Insurance Company ("Balboa"), National General Insurance Company, individually and as successor-in-interest to Balboa ("National General"), Dawn Martin Harp ("Harp"), Bill Katafias ("Katafias"), and John Does 1-10 (all collectively "Defendants").

2.     Plaintiffs' allegations are based upon personal knowledge as to their own acts and upon information and belief as to all other matters alleged herein, including the investigation of counsel, publicly available information, news articles, press releases, and additional analysis.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

3.     After nearly a decade of deception, Defendants' fraudulent scheme of duping hundreds of thousands of auto loan customers into paying for unnecessary and unwanted auto collateral protection insurance and additional fees and charges has finally come to light.  As a direct result of Defendants' continuous scheme, consumers nationwide are still feeling the effects of being forced into paying for unnecessary auto insurance policies, incurring substantial unwarranted fees and charges, suffering from negative credit reporting and other delinquencies, and/or having their vehicles repossessed.

4.     Plaintiffs bring this proposed class action on behalf of themselves and all other persons who had an automobile loan originated by Defendant Wells Fargo Bank, N.A. through its division, Wells Fargo Dealer Services and, in connection therewith, were charged for lender-placed or "force-placed" automobile insurance policies, called "collateral protection insurance" ("CPI"), provided by Balboa and/or National General on the secured personal property within the applicable statute of limitations (the "Class Period").

5.     Lenders often require borrowers to purchase and agree to maintain insurance coverage on automobiles purchased as a condition to funding automobile loans.  Plaintiffs were required to obtain and maintain such insurance as a condition of their automobile loan from Wells Fargo Bank.

6.     In the event that borrowers fail to maintain insurance on their automobiles while they still owe money to the lender, lenders, through agreements with insurers/service providers, can choose to replace borrowers' insurance policies with more expensive ones, in the form of CPI.  Lenders charge the premium associated with such policies to borrowers' accounts, as well as attendant fees, adding to borrowers' monthly payments.  Many states require that borrowers be informed of the fact that they will be force-placed prior to the lender purchasing such insurance for their vehicles.

7.     In order to ascertain which borrowers have automobile insurance policies that have lapsed, lenders such as Wells Fargo Bank maintain agreements with service providers, such as Balboa and/or its affiliates and National General, to track and monitor whether their borrowers maintain the required insurance.  If the borrowers' voluntary automobile insurance has lapsed, the service provider then mails any notices required by law, and provides the CPI if necessary.  When Balboa or National General provided CPI, Wells Fargo Bank would pay for the policy and then charge borrowers' accounts for the policy as well as any related fees, raising the borrowers' monthly payments.

8.     Defendants acted together to exploit Wells Fargo Bank's ability to force-place insurance to reap additional, unjustified profits in the form of premiums, commissions, fees and other financial benefits at the expense of borrowers who were charged for force-placed insurance but had not let their voluntary automobile insurance lapse and/or were not properly notified of the force-placed insurance as required under state law.  *See Wells Fargo Announces Plan to Remediate Customers For Auto Insurance Coverage* (July 27, 2017), attached hereto as Exhibit A.

9.     However, Wells Fargo's announced plans to refund millions to borrowers does not cover those borrowers who paid premiums, fees, and other charges when Wells Fargo and Wells Fargo Bank used Balboa and/or its affiliates as their insurance tracking and CPI provider in the scheme.  Even now, Wells Fargo has blamed its outside provider, National General, for the wrongful placement of CPI, even though this scheme predates National General's involvement and was, in fact, originated and orchestrated by Wells Fargo and Wells Fargo Bank.

10.     Defendants' web of relationships, and the arrangements between them, funneled unjust and unearned profits and/or other illicit benefits to the Defendants through their collusive activities.  Each Defendant participated in the scheme with the knowledge and collusion of the other participants as described in greater detail herein.

11.     In this action, Plaintiffs challenge Wells Fargo Bank's practice of charging borrowers for CPI from Balboa and/or National General even though the borrowers' voluntary insurance had not lapsed.  This unnecessary force-placement of insurance was unauthorized by contract, unjustified, and unfairly imposed costs and undue burden on the borrowers in violation of the law.

12.     Throughout the Class Period, Defendants have engaged individually and in concert with one another, in unlawful, abusive and unfair practices with respect to CPI, which practices included, among other things: (a) purchasing CPI and/or charging borrowers for CPI whose voluntary automobile insurance had not lapsed; (b) charging class members fees and interest related to the unlawfully purchased CPI; (c) receiving commissions and/or other things of value from providers of CPI; (d) forcing borrowers to pay for duplicative insurance coverage; (e) wrongfully reporting borrowers as delinquent and/or wrongly repossessing vehicles in connection with the scheme; (f) using the mail and wires to conduct a scheme to defraud Plaintiff and the Class by unlawful purchasing and charging borrowers for unnecessary CPI; (g) misrepresenting that Defendants were force-placing insurance on Plaintiffs' and Class Members' automobiles lawfully, but

instead, doing so as a means of generating illicit, unreasonable and unwarranted financial benefits for each of the Defendants in violation of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); and (h) conspiring to take advantage of their contractual authority to issue CPI to Plaintiffs and Class members pursuant to pre-arranged agreements that return an undisclosed and improper financial benefit to each Defendant in violation of RICO, 18 U.S.C. § 1962(d).

13.     Plaintiffs assert the following claims against Defendants: (a) claims for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as further described below; (b) claims for engaging in a conspiracy to defraud Plaintiffs and the Class in violation of RICO 18 U.S.C. § 1962(d); and (c) claims for violation of California Business & Professions Code § 17200, *et seq*.

14.     Accordingly, Plaintiffs challenge Defendants' unlawful conduct and seeks statutory and compensatory damages.

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Charles Heiman ("Plaintiff Heiman") resides in Hondo, Texas, and is a citizen of Texas.

16.     Plaintiff Heiman purchased a 2002 Chevrolet Silverado truck, financed with an executed loan agreement with Wells Fargo Bank.  Since his purchase of the vehicle, he has at all times maintained comprehensive and collision coverage as per the terms of the loan.

17.     In 2008, Plaintiff Heiman received a notice purportedly from Wells Fargo Bank indicating that he did not have the proper insurance on his truck and that a CPI policy would be force-placed on his vehicle if he did not provide proof of coverage. Plaintiff Heiman immediately contacted his insurance agent, who then contacted Wells Fargo Bank and Balboa Insurance Company to provide proof of coverage.

18.     Wells Fargo Bank and Balboa Insurance Company force-placed a CPI policy on the truck despite having proof that Plaintiff Heiman maintained adequate insurance coverage.  Plaintiff Heiman was forced to pay for the CPI and the attendant fees, including late fees on the auto loan account.

19.     While Plaintiff Heiman disputed the placement of the CPI policy and its charges to his auto loan account, Wells Fargo Bank repossessed the truck and reported Plaintiff to the various credit agencies.

20.     Subsequently, Wells Fargo Bank and Balboa Insurance Company admitted that the CPI policy had been placed in error, removed the policy, and refunded the premium to Plaintiff Heiman's account.  However, they did not immediately return his truck to his possession, claiming they would need sixty days to do so.

21.     When Plaintiff Heiman went to the yard in which Wells Fargo Bank was keeping his truck, he found that all of his personal possessions from inside the vehicle had been removed and that roofing materials, including buckets of tar, had been placed into the truck.  Additionally, Plaintiff Heiman observed dings, scratches and other damage to the truck that had not been on the vehicle previously.

22.     While fighting with Wells Fargo Bank for the return of his vehicle, Plaintiff Heiman was forced to purchase a second truck, in order to maintain his job.  In addition to sales taxes, transaction costs and/or other costs and inconveniences Plaintiff Heiman was forced to bear, because Wells Fargo Bank had reported the repossession to the credit bureaus, Plaintiff Heiman ultimately paid more for this second vehicle that he otherwise would have without the erroneous information on his credit report.

23.     Wells Fargo Bank eventually allowed Plaintiff Heiman to pick up his now damaged truck from their yard, refusing to deliver the truck to him.  However, Wells Fargo Bank refused to pay for the damage to his vehicle.

24.     As a result of the incorrect information on his credit report, Plaintiff Heiman has been harmed financially, including significant detrimental effects on his ability to

CLASS ACTION COMPLAINT

finance the new purchase of a car.  Throughout his ordeal with Wells Fargo Bank and Balboa Insurance Company, both Defendants denied any wrongdoing.

25.    Plaintiff Misty Alexander ("Plaintiff Alexander") resides in Saginaw, Texas and is a citizen of Texas.

26.    Plaintiff Alexander executed a loan with Wells Fargo Bank in 2013 for her Land Rover vehicle.   Since her purchase of the vehicle, she has maintained both comprehensive and collision coverage of the car via Allstate Insurance.

27.    Despite the fact that at all times she maintained insurance on her vehicle, Plaintiff Alexander was charged repeatedly for CPI since 2013.  Records of such charges are in Defendants' possession.  The CPI charges and additional fees in connection with such charges were debited automatically from her Wells Fargo checking account.

28.    Plaintiff Alexander repeatedly informed Wells Fargo Bank and National General of her voluntary insurance policy and forwarded the proof of that insurance after each instance of force-placement.  Wells Fargo Bank subsequently failed to fully refund the charges for CPI, including the subsequent late fees they charged to her account.

29.    On information and belief, Wells Fargo Bank also reported Plaintiff Alexander to credit bureaus for purported delinquencies related to her supposed failure to procure insurance and/or timely pay all charges wrongly assessed.

**B.    Defendants**

30.    Defendant Wells Fargo & Company is a Delaware corporation and a bank holding company with its principal place of business located in San Francisco, California. Upon information and belief, Wells Fargo participated in the conduct alleged herein from its offices in San Francisco, including the decisions (and/or ratification of decisions) to enter into agreements with National General to wrongfully force-placed CPI on hundreds of thousands of borrowers throughout the United States in order to generate revenue via commission sharing, unearned fees assessed to borrower accounts, reselling wrongfully repossessed vehicles and/or other financial benefits.

31.     Defendant Wells Fargo Bank, N.A., through its division Wells Fargo Dealer Services, is a national association bank chartered in South Dakota with its principal place of business in Irvine, California.  The members of Wells Fargo Bank's Board of Directors also serve as Directors of Wells Fargo.  Wells Fargo Bank directly owns the loans which are secured by the Class Members' automobiles, which are located throughout the United States.  Wells Fargo Bank is the primary entity used by Wells Fargo for the origination and servicing of automobile loans.  Upon information and belief, executives within Wells Fargo Bank at its Irvine headquarters implemented and oversaw operations of the CPI scheme in order to benefit financially, including through commissions on the wrongfully placed CPI and/or through additional fees assessed to the accounts of those same borrowers, along with other benefits.

32.     Defendant Balboa Insurance Company was a California corporation headquartered in Irvine, California.  When Wells Fargo Bank initiated its CPI program, Balboa and/or its affiliates were the outside service providers for all aspects of the program, including insurance tracking, borrower notification and policy placement.  As a result, Balboa provided CPI policies on vehicles located throughout the United States, including California. Balboa's participation in the scheme was approved by and managed by executives located in Irvine, California, and all CPI policies were issued from Irvine, California. At the time of their original agreement with Wells Fargo Bank, Balboa was a wholly-owned subsidiary of Bank of America.  In June 2011, Balboa was sold to QBE Insurance Group Limited and its operations were taken over by QBE Insurance Corporation and its affiliates.  In October 2015, National General Holdings Corp. acquired the lender-placed insurance business of QBE Insurance Group Limited, including the CPI business, which it subsequently branded National General Lender Services. Upon information and belief, Balboa participated in the wrongful conduct alleged herein in order to benefit financially and each of its successors-in-interest continued to deny any wrongdoing for its previous actions.

- 8 -

CLASS ACTION COMPLAINT

33.     Defendant National General Insurance Company is a North Carolina corporation headquartered in Winston-Salem, North Carolina. National General administers the CPI portion of the National General Lender Services business on behalf of its parent corporation, National General Holdings Corp.  It also provided both the insurance tracking services and the CPI policies on automobiles located through the United States, including California, for Wells Fargo Bank from January 2012 until September 2016.  Upon information and belief, National General continues to deny that either Balboa or National General acted improperly.  Upon information and belief, National General participated in the wrongful conduct alleged herein in order to benefit financially.

34.     Defendant Dawn Martin Harp is the former president of Wells Fargo Dealer Services, a position she held for six years prior to her retirement in April 2017.  Prior to becoming president of Dealer Services, she served as the chief operating officer since at least 2008 with particular concentration in the Indirect Auto Finance unit.  Upon information and belief, Harp also served as an executive vice president for Wells Fargo.  Harp resides in Dana Point, California.  Upon information and belief, in her position with Wells Fargo Bank, Ms. Harp orchestrated and/or oversaw and helped to effectuate the scheme complained of herein.

35.     Defendant Bill Katafias is the former executive vice president and head of the Indirect Auto Finance team at Wells Fargo Dealer Services.  In this role, Katafias was involved in retail production oversight of regional dealer partners, the centralized direct lending operation, operational risk management of indirect sales, and recreational finance.  He left his role at Wells Fargo Bank in February 2017, where he had been since 2008.  At all times, he was involved in overseeing the day-to-day operations of the CPI scheme for Wells Fargo Dealer Services. Katafias resides in Ladera Ranch, California.  Upon information and belief, in his position with Wells Fargo Bank, Mr. Katafias helped to implement and/or effectuate the scheme complained of herein.

CLASS ACTION COMPLAINT

## III.   JURISDICTION AND VENUE

36.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962, and 1964.  This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of a proposed Class including hundreds of thousands of members, the aggregate claims of the putative Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the putative Class are citizens of a different state than each of the Defendants.

37.     In addition, this Court has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy is greater than $75,000 and this matter is between citizens of different states.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

38.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside and/or regularly conduct business in this district and/or a substantial part of the events giving rise to the claims occurred in this district.

## IV.   FACTUAL ALLEGATIONS

### A.   Wells Fargo and Wells Fargo Bank Collusively Preyed on Borrowers in Pursuit of Unearned Profits

39.     On July 27, 2017, Wells Fargo announced that it would compensate approximately 570,000 customers who were wrongfully charged for CPI.  According to the announcement, a review undertaken in July 2016 revealed that approximately 490,000 borrowers had CPI placed when they already had adequate voluntary insurance, approximately 60,000 did not receive the disclosures required by law prior to the placement of CPI, and approximately 20,000 suffered a car repossession after the wrongful CPI charges contributed to a default on their car loan.  Wells Fargo said it would pay approximately $80 million to these borrowers, in cash and account adjustments, to cover

the costs of the premiums, as well as some fees and, for those who suffered repossession, the partial value of the car.  *See* Exhibit A.

40.    This announcement came following an explosive New York Times article uncovering an internal investigation that revealed 800,000 borrowers were affected by the wrongful placement of CPI.  *See Wells Fargo Forced Unwanted Auto Insurance on Borrowers*, July 27, 2017, attached hereto as Exhibit B.

41.    Wells Fargo attempted to avoid responsibility, placing the blame for the mistaken force-placements on its outside vendor, National General, in its press release, and praising itself for acting quickly to investigate customer complaints from July 2016.  Yet the public face-saving was too little too late for Wells Fargo, as Wells Fargo Bank has been the subject of numerous complaints about their CPI practices for years to the Consumer Financial Protection Bureau ("CFPB").  *Id.*

42.    Indeed, Wells Fargo and Wells Fargo Bank were investigated and sued by the Department of Justice ("DOJ") on behalf of servicemembers whose cars had been wrongfully repossessed in violation of the Servicemembers Civil Relief Act ("SCRA"). Although Wells Fargo claims it became of aware of issues at Wells Fargo Bank and National General in July 2016, Wells Fargo Bank, had been investigated and sued by the DOJ for at least a year prior for its conduct related to car loan delinquencies and repossessions.  *See Justice Department Reaches $4 Million Settlement with Wells Fargo Dealer Services for Illegally Repossessing Service members' Cars*, September 29, 2016, attached hereto as Exhibit C.  *See also* Consent Order For a Civil Money Penalty *In the Matter of Wells Fargo Bank, N.A.* dated September 29, 2016, attached hereto as Exhibit D.

43.    The DOJ began an investigation in March 2015 and found that Wells Fargo Bank had been engaging in unlawful conduct with respect to service members' vehicles **since at least 2008**.  Wells Fargo Bank agreed to pay $20 million in civil penalties, with an additional $4.1 million to the wronged servicemembers, as a result of the investigation and to change its CPI practices, particularly with regard to sending out accurate notifications to

servicemembers and verifying that the information they presented to courts when pursuing delinquent payments and/or repossessions was in fact accurate.  The Consent Order was signed by the members of the Board of Directors for Wells Fargo Bank, who also served as members of the Board of the Directors for Wells Fargo. *See id.*

44.    This was simply the latest scandal to hit Wells Fargo and its subsidiaries, following the disclosure last year that branch workers had been directed to open millions of unauthorized credit card and bank accounts for customers in order to meet internal company goals.  As a result, Wells Fargo Bank was fined $185 million for that scandal just last year and its CEO, who was also the CEO of Wells Fargo, John Stumpf, was forced to resign.

45.    Other previous scandals to hit Wells Fargo and its subsidiary in recent years include improper mortgage charges, some related to the force-placed insurance on homes, the improper targeting of immigrants and older customers with memory problems in opening new accounts, and filing false documentation in courts in mortgage disputes with borrowers.   There have been further reports that Wells Fargo Bank also opened unauthorized "phantom" accounts in the name of brokerage and small business clients.

46.    Prudential Financial Inc. also cut ties with Wells Fargo Bank earlier this year, after being sued by former executives in its investigation division for wrongful termination following their discovery that Wells Fargo Bank employees had been signing up bank customers for Prudential MyTerm life insurance policies without their knowledge or permission.   The bank employees, who were not licensed to sell insurance, were supposed to direct interested customers to special kiosks located in the banks or to Prudential's online portal.  Instead, they opened accounts in the customers' name and withdrew the premiums directly from their bank accounts, sometimes canceling the policy after a month or two.

47.    In the summer of 2016, concurrent with the DOJ's ongoing investigation into Wells Fargo Bank's CPI policies with respect to servicemembers, Wells Fargo hired

outside consultant Oliver Wyman to investigate the conduct of Wells Fargo Bank and its outside vendor, National General.   Despite the scope of the DOJ's investigation and findings, ***going all the way back to 2008***, Wells Fargo directed Oliver Wyman only to review conduct and any resultant placement of insurance starting in January 2012.

48.     Upon information and belief, despite the ongoing investigation, Wells Fargo Bank ended its CPI program entirely in September 2016, at the direction of Wells Fargo. Only two service providers were involved during the entirety of the program: Balboa, from the program's inception in 2006 through 2011, and National General, from 2012 until the program's end in 2016.

49.     Oliver Wyman completed its investigative report in February 2017. However, Wells Fargo and Wells Fargo Bank stayed silent, failing to announce the results of their own investigation until July 27, 2017, only after the publication of the New York Times report.  *See Wells Fargo Planned to Eventually Tell Public about Auto Insurance Programs – Executive*, July 28, 2017, attached hereto as Exhibit E.  Wells Fargo also blamed Harp and Katafias, among others, for the failures of Wells Fargo Bank.  *Id*.  No mention was made about the existence of the same problems before National General's involvement, despite the DOJ's findings of malfeasance going as far back as 2008 when Balboa was the service provider.

50.     In a similar vein of understating the expanse of the wrongdoing, despite the fact that it had commissioned the report, Wells Fargo disagreed with the conclusions. While Oliver Wyman found that over 800,000 customers had been wrongfully charged for CPI, and in some instances were still paying for it, Wells Fargo said that only 570,000 borrowers were affected.  The Oliver Wyman report found that 274,000 borrowers had been pushed into delinquency due to the unlawful practice, that 100,000 had not received proper notifications prior to force-placement, and that almost 25,000 borrowers suffered wrongful vehicle repossessions.  In its own self-serving press release, Wells Fargo tried to

downplay the statistics, stating that only 60,000 failed to receive proper notice and only 20,000 suffered wrongful repossession. *See Wells Fargo Forced.*

51.     Neither the numbers of affected borrowers from the Oliver Wyman report nor Wells Fargo's alternative numbers include those wrongfully force-placed when Balboa was the service provider.

52.     Because Wells Fargo disagrees with its own report, but has yet to make any supporting information publicly available, it is unknown at this time how many borrowers were actually affected by the unlawful placement of CPI or whether all damaged borrowers are being compensated by its announced repayment plan.

53.     For its part, National General denies any wrongdoing.  A spokesperson for the insurance company, Christine Worley, Director of Investor Relations at National General Holding Corp., said that it "feels confident with its compliance in this highly regulated industry.  We have always refunded premiums directly to our financial institutions customers in a timely manner and provided all necessary notifications in compliance with law and industry practice." *See Wells Fargo to Refund $80 Million to Auto-Loan Customers for Improper Insurance Practices*, July 28, 2017.

54.     This latest misconduct has analysts concerned about the lack of controls on the conduct of Wells Fargo Bank by itself and its parent, Wells Fargo.  "The steady drip of revelations is concerning as it makes quantifying and qualifying the extent of the internal control failures difficult," said Isaac Boltansky, an analyst at Compass Point Research & Trading. *Wells Fargo May Have Charged 500,000 Clients for Unwanted Insurance*, July 28, 2017, attached hereto as Exhibit F.  Another analyst from Atlantic Equities, Christopher Wheeler remarked, "What has been shown is that the bank was run for superior revenue growth, and the controls around managing that were clearly insufficient." *Id.*

55.     In fact, in January 2017, Wells Fargo Bank praised the efforts of Harp when it announced her retirement from Wells Fargo Dealer Services, effective April 2017, citing

the growth of the division and its revenues under her management.   *See Dawn Martin Harp to Retire as President of Wells Fargo Dealer Services*, January 11, 2017, attached hereto as Exhibit G.

56.     The continuing revelations of illicit conduct throughout multiple divisions of Wells Fargo Bank shows a continuing, knowing pattern of behavior to pursue unearned, illicit profits from its customers.  The wrongful placement of hundreds of thousands of CPI policies was simply another scheme by Wells Fargo and Wells Fargo Bank to charge wrongfully its borrowers and acquire unearned profits.  Wells Fargo and Wells Fargo Bank were determined to continue this scheme and so only contracted with service providers who were willing to participate, such as Balboa and National General.

57.     Typically, when lenders provide financing to borrowers for the purchase of an automobile, they frequently require that the borrower secure comprehensive and collision coverage for that vehicle within the terms of the loan, so that the lender's interest is protected in case of accidents or other damage to the vehicle.

58.     In order to determine which borrowers are maintaining their required coverage, lenders employ third party service providers to track the insurance of cars within their lending portfolios.  Often, these vendors also provide an insurance policy for the lenders to purchase if a vehicle is found to be uninsured.  The lender then passes on the charge to the borrowers, adding fees and premium charges to the loan balance and/or the monthly payment due under the terms of the loan agreement.

59.     The purchasing of a policy for a borrower's vehicle under the terms of the loan agreement is called forced-placement and is referred to as CPI within the industry.

60.     Prior to making a forced-placement, service providers must send notifications to the borrower that they are required to maintain insurance on their vehicle by the terms of their loan and, if they fail to secure their own coverage, the lender will authorize the service provider to purchase a policy for them, often at higher prices than the borrower would be able to secure on the voluntary insurance market.  Some states have more

– 15 –

CLASS ACTION COMPLAINT

fulsome notification requirements than others, notably Arkansas, Michigan, Mississippi, Tennessee and Washington.

61.     The CPI industry is mostly concentrated in credit unions and smaller banking institutions, whose auto loan portfolios represent a more significant percentage of their overall business.  Wells Fargo Bank is one of the few of the largest American banks to require CPI terms in its loans.  Its CPI program began in 2006 and ended in September 2016.

62.     Upon information and belief, in 2006, Wells Fargo Bank entered into an agreement with Balboa, at the behest of its parent corporation, Wells Fargo.  As a result, Balboa and/or its affiliates provided insurance tracking, notification to borrowers, and CPI policies on behalf of Wells Fargo Bank from 2006 until the end of 2011.

63.     Upon information and belief, Balboa was chosen as the automobile insurance tracking and CPI provider because of their willingness to share commissions on the CPI sales, as well as provide other things of value, with Wells Fargo Bank.

64.     Upon information and belief, following the sale of Balboa to QBE Insurance Company, Wells Fargo Bank entered an agreement with National General, at the behest of its parent corporation, Wells Fargo.  National General would provide insurance tracking services for Wells Fargo Bank and force-place a policy on any uninsured vehicle that it found, following notice to the borrower.  This agreement was effective January 1, 2012.

65.     Upon information and belief, National General was chosen as the automobile insurance tracking and CPI provider because of their willingness to share commissions on the CPI sales, as well as provide other things of value, with Wells Fargo Bank.

66.     Under the original terms of the deal, Wells Fargo Bank would pay National General for any policies it force-placed, including fees and commissions, as Balboa had done before.  Wells Fargo Bank would then receive a portion of the commission back from National General, as part of a revenue-sharing arrangement.  In turn, Wells Fargo Bank would charge the borrower's loan account, which sometimes would be linked to a Wells

Fargo bank account for automatic payments.  The original scheme continued, simply with a new service provider.

67.     According to the Oliver Wyman report, Wells Fargo Bank stopped taking commissions in February 2013.  However, it continued to assess fees and other charges on borrowers' loan accounts in the event that a CPI policy was placed.

68.     Upon information and belief, in order to maximize revenue under the terms of their arrangement, National General instituted and continued to use a tracking system that failed to find coverage for automobiles in Wells Fargo Bank's loan portfolio at a higher rate than actually existed within the portfolio.  It also failed to ensure that proper notification to borrowers about their lack of insurance was issued prior to the forced-placement of the CPI policies.

69.     Upon information and belief, despite the fact that the nationwide rate of car owners who fail to maintain insurance on their vehicle is about 14%, throughout the Class Period, National General found a significantly higher rate among Wells Fargo Bank's portfolio, as much as 50% higher.

70.     The artificially high rate of coverage lapses combined with National General's purposefully designed notification system which failed to warn borrowers of the impending force-placement of CPI, ensured that National General would be able to sell hundreds of thousands more policies and recoup millions in unearned profits from the fraudulent policy premiums and commissions.

71.     Furthermore, National General instituted policies and procedures, both formal and informal, that both made it more difficult for borrowers to prove they had voluntary coverage and intentionally slowed down the process of CPI removal.  The effect of such policies was to ensure that Wells Fargo Bank and National General would be able to charge additional fees to Class members, even if the CPI premium itself was eventually refunded.

72.     Wells Fargo Bank, meanwhile, reaped the benefits, enjoying the added revenue stream of commissions from the CPI, as well as added fees to borrowers' accounts, and other benefits.  Some of the other financial benefits to Wells Fargo Bank included fees from overdrawn accounts, for those borrowers' whose auto loan payments were automatically deducted from their checking or savings accounts, as well as extra fees and charges assessed to customers after reporting their delinquency on credit reports prior to selling them other products.

73.     Wells Fargo Bank's role in this scheme was managed by Harp, as Chief Operating Officer and then President of Wells Fargo Dealer Services, and by Katafias, the head of Indirect Auto Lending at Wells Fargo Dealer Services, throughout the Class Period.  Both former executives were identified as being responsible for oversight of National General by Franklin Codel, Head of Consumer Lending for Wells Fargo.

74.     Indirect Auto Lending is, in fact, the bulk of Wells Fargo Bank's auto loan portfolio, with 3.7 million loans compared to less than 250,000 for direct auto lending.  Katafias, identified as Harp's deputy by Codel, was the executive in charge of all aspects of indirect auto lending and financing during the Class Period.  Upon information and belief, both he and Harp were tasked by Wells Fargo and Wells Fargo Bank to pursue any and all revenue streams from this portfolio, including any way to maximize profits to both their division and other Wells Fargo Bank divisions, such as Consumer Lending, and both were incentivized and benefited monetarily by the acts complained of herein.

**B.     Plaintiff and Members of the Classes Suffered Harm as a Result of Defendants' Collusive Practices**

75.     Defendants reaped immense profits at the expense of borrowers through their CPI scheme.  While Defendants continued to line their pockets, borrowers were forced to pay for unnecessary and unwanted CPI, and were further duped into paying charges to maintain their accounts, avoid further late fees and interest charges, and avoid repossession of their vehicles.  Borrowers also had to expend substantial time and resources trying to

prove to Wells Fargo Bank that they in fact had proper insurance coverage in place and in trying to repair their credit history.

76.     Often borrowers were unaware that Balboa and/or National General had even issued the force-placed CPI policies, as they and Wells Fargo Bank failed to notify its customers of the costly and duplicative insurance policies that they unilaterally purchased on borrowers' behalves.  Wells Fargo's failure to notify borrowers of anticipated—or previously force-placed—CPI was not only unethical, but in violation of the law. According to a Wells Fargo consultant, between 2012 and 2016, almost 100,000 CPI policies violated the disclosure requirements of five states—Arkansas, Michigan, Mississippi, Tennessee and Washington.  Even when borrowers notified Defendants about the wrongfully placed coverage, Defendants routinely refused to remove the policies or refund past payments.

77.     For many borrowers, the harm extended far beyond the payment of unnecessary force-placed CPI.  For example, for those borrowers who had arranged for their monthly loan payments to be automatically deducted from their checking accounts, many borrowers were unaware that Wells Fargo had imposed additional charges, oftentimes leading borrowers' accounts to become overdrawn as a result of the increase in the automatic deduction.  Borrowers were then charged additional fees and penalties on their overdrawn accounts.

78.     Wells Fargo and/or Wells Fargo Bank also maximized its profits by crafting its payment system to apply payments in a designated sequential order, thereby squeezing the most out of the interest payments that borrowers would pay over the life of their loans.

79.     For some borrowers, the wrongful placement of CPI drove them into delinquency on their car loans, ultimately leading Wells Fargo Bank to repossess their cars, sell them and then continue to hound borrowers for funds to pay off the loans.

80.     Borrowers also suffered the imposition of extra fees, charges and higher interest rates from other financial institutions based on credit delinquencies that Wells Fargo Bank had reported on borrowers' car loans as a result of the wrongfully placed CPI.

81.     At the expense of borrowers, Wells Fargo orchestrated the arrangement between Wells Fargo Bank, and Balboa and then National General as a part of its overall plan to maximize revenue at all costs.  The wrongful earnings of Wells Fargo Bank as a result of the CPI scheme flowed to Wells Fargo, leading to higher revenues, which it reported quarterly and annually to shareholders.

82.     Wells Fargo's current attempt to remedy its wrongs by making borrowers "whole" is inadequate, as many borrowers have suffered the effects of Wells Fargo's wrongdoing far beyond the imposition of unwarranted CPI.

83.     As a result of the CPI scheme, the Oliver Wyman report concluded that borrowers are owed at least $73 million.  Despite disagreeing with the report, particularly with the number of borrowers harmed, Wells Fargo announced it would be distributing $80 million to affected borrowers.  However, Wells Fargo's own press release indicated that some borrowers would only receive refunds of "certain fees," and has offered no accounting of how it decided which fees would be refunded.  Furthermore, there is no compensation forthcoming to any borrower from the time period when Balboa was the CPI provider.

84.     As a result of the CPI scheme, Plaintiffs and Class members suffered substantial damages, including wrongful CPI charges, assessed fees, additional expenses and costs, damage to their credit reports, delinquencies and/or repossessions.

V.    TOLLING

85.     Plaintiffs and members of the Classes had no way of knowing the true nature and extent of Defendants' CPI scheme necessary to prosecute their claims.  As demonstrated by Wells Fargo's belated announcement of the investigation into its Wells Fargo Bank which commenced over a year ago, Defendants were intent on hiding their

behavior from regulators and borrowers.  In fact, National General continues to deny it did anything improper.

86.     Defendants were under a continuous duty to disclose to Plaintiffs and members of the Classes the true character, quality, and nature of the charges that they assessed to borrowers' accounts.

87.     Defendants knowingly and actively concealed the CPI scheme, and Plaintiffs and members of the Classes reasonably relied upon Defendants' knowing and active concealment.  Plaintiffs and members of the Classes thus had no way of knowing the true character, quality and nature of the charges that they were assessed.

88.     Given Defendants' knowing and active concealment, Plaintiffs and members of the Classes could not have discovered, through the exercise of reasonable diligence, the true nature of Defendants' unlawful conduct and unwarranted charges to their accounts.

89.     Accordingly, the applicable statutes of limitations have been tolled by operation of the discovery rule and Defendants' fraudulent concealment with respect to all claims alleged herein, and Defendants are estopped from relying on any statutes of limitations in defense of this action.  Further, Defendants' conduct, as directed by Wells Fargo and Wells Fargo Bank, was part of a continuing, systematic practice, with the last act in the fraudulent scheme taking place within the applicable statute of limitations.  As such, the Defendants are liable for all acts undertaken as part of the scheme as continuing violations.

## VI.   CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class and Sub-Class:

**Nationwide Class:**  All persons who were charged premiums and/or related fees for collateral protection insurance placed by Wells Fargo Bank prior to September 30, 2016, within the applicable statute of limitations.

**Texas Sub-Class:**  All residents of Texas who were charged premiums and/or related fees for collateral protection insurance placed by Wells Fargo Bank

prior to September 30, 2016, within the applicable statute of limitations (the "Texas Sub-Class").[1]

91.    Excluded from the proposed Class and Sub-Class are Wells Fargo, as well as its agents, officers, and directors, and their families, as well as its parent companies, subsidiaries, and affiliates.  Any judicial officer assigned to this case is also excluded. Plaintiff reserves the right to revise the definition of the Class and Sub-Class based upon subsequently discovered information.

92.    This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

93.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are hundreds of thousands of proposed members of the Classes throughout the United States.

94.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes.  The common questions of law and fact include but are not limited to:

a)    whether Defendants unlawfully purchased CPI for borrowers whose voluntary automobile insurance had not lapsed;

b)    whether Defendants wrongfully charged members of the Classes fees and interest related to the unlawfully purchased CPI;

c)    whether Defendants received commissions and/or other things of value from providers of CPI;

d)    whether Defendants unlawfully forced borrowers to pay for duplicative coverage;

_____

[1]   The Nationwide Class and the Texas Sub-Class are collectively referred to as "the Classes."

e)      whether Defendants used the mail and wires to conduct a scheme to defraud Plaintiff and the Class by unlawfully purchasing and charging borrowers for unnecessary CPI;

f)      whether Defendants misrepresented that they were force-placing insurance on Plaintiff's and members of the Classes' automobiles lawfully, but instead did so to generate unreasonable and unwarranted profit for each of the Defendants;

g)      whether Defendants conspired to take advantage of their contractual authority to issue CPI to Plaintiff and members of the Classes pursuant to pre-arranged agreements that returned an undisclosed and improper financial benefit to each Defendant;

h)      whether Defendants violated 18 U.S.C. § 1962(c);

i)      whether Defendants violated 18 U.S.C. § 1962(d);

j)      whether Defendants violated Cal. Bus. & Prof. Code § 17200, *et. seq.*; and

k)      whether Plaintiffs and members of the Classes are entitled to actual damages, statutory damages, treble damages, punitive damages, restitution, restitutionary disgorgement, and/or other equitable or declaratory relief.

95.     Plaintiffs' claims are typical of the claims of the Classes.  As alleged herein, Plaintiff and members of the Classes all sustained damages arising out of the same course of unlawful conduct by Defendant.

96.     Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Classes and has no interests adverse to, or which conflict with, the interests of the other members of the Classes.

97.     Plaintiffs' interests are co-extensive with, and not antagonistic to, those of the absent members of the Classes.  Plaintiffs will undertake to represent and protect the interests of the absent members of the Classes.

98.     Plaintiffs have engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and the absent members of the Classes.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

100.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

101.    The interest of members of the Classes in individually controlling the prosecution of separate actions is theoretical and not practical.  Prosecution of the action through multiple representatives would be objectionable and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

## VII.   CLAIMS

### FIRST CLAIM

**VIOLATION OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C)
ON BEHALF OF THE NATIONWIDE CLASS AND THE SUB-CLASS AGAINST
ALL DEFENDANTS**

102.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

103.    Plaintiffs, each member of the Classes, and Defendants are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

**B.      Enterprise**

104.   For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, Katafias, and Non-Parties Affiliated with the RICO Enterprise identified above, including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise").   The Enterprise is separate and distinct from the persons that constitute the Enterprise.

105.   The Enterprise was primarily managed by Wells Fargo and Wells Fargo Bank in conjunction with Balboa and then later, National General, and other members.

106.   The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers by charging them for CPI that was not necessary.   The purpose thereof was to induce borrowers to pay amounts which Wells Fargo and Wells Fargo Bank were not entitled to collect.

107.   At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce.   The proceeds of the Enterprise were distributed to its participants.

108.   The Enterprise has operated from at least January 2012 and its operation is ongoing.   The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the participants engage.

**C.      The Pattern of Racketeering Activity**

109.   At all relevant times, in violation of 18 U.S.C. § 1962(c), Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.   Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a)      Wells Fargo and/or Wells Fargo Bank entered into agreements with Balboa, and later, National General, in which they agreed to use these companies as the provider of CPI.

b)      In exchange for agreeing to use Balboa and later, National General, as its CPI provider, Balboa and National General initially agreed to funnel a portion of the CPI charges back to Wells Fargo and/or Wells Fargo Bank, disguising such payments as "commissions."

c)      However, the commissions were not legitimate, but instead were designed solely as a mechanism to funnel money back to Wells Fargo and/or Wells Fargo Bank as a quid pro quo for using Balboa and/or National General as its CPI provider.

d)      These payments were disguised as "commissions" to hide the true nature of these payments.

e)      In addition, Wells Fargo and Wells Fargo Bank and Balboa and National General generated illicit profits by falsely representing to borrowers that CPI was required, and charging borrowers for CPI, when the borrowers were actually not required to pay for CPI.

f)      In or around February 2013, Wells Fargo and/or Wells Fargo Bank reportedly ceased accepting "commissions," but they and National General continued to profit through the Enterprise.

g)      For example, National General continued to profit from the sale of CPI to borrowers who were not required to pay for such insurance.

h)      Wells Fargo also generated additional profits because, once CPI was force-placed on a borrower's vehicle, additional fees were charged and the amount was often automatically deducted from the borrower's account, often forcing the account into delinquency and generating yet more fees for Wells Fargo.

i)      In some cases, borrowers' vehicles were repossessed, which further increased the charges and fees Wells Fargo imposed on borrowers and allowing Wells Fargo and/or Wells Fargo Bank to profit from the resale of the vehicle.

j)      Wells Fargo also continued to receive loan monitoring services from National General, a cost that should be carried by Wells Fargo as the loan servicer, not shouldered by borrowers whose insurance was unlawfully force-placed.

k)      In all cases, borrowers were not fully informed about the amounts charged as CPI.  In many instances, borrowers received no notice, even when legally required and in other cases where notice was delivered, the notices falsely represent that borrowers were required to pay for CPI.

l)      In addition, the notices and billing statements were designed to lull borrowers into believing that no fraudulent scheme was occurring and that Wells Fargo and/or Wells Fargo Bank and Balboa and National General were simply exercising their rights under borrowers' loan agreements.  Wells Fargo and/or Wells Fargo Bank and Balboa and National General sent these unremarkable statements through the mail to lull Plaintiff and the Class members into a false sense of security, making it less likely that borrowers would object to the improper charges, complain to the authorities, or bring lawsuits.

m)      Correspondence between Wells Fargo and/or Wells Fargo Bank and Balboa and National General were further exchanged by means of wire communication in interstate commerce writings.

n)      Additionally, amounts extracted from borrowers by way of the fraudulent scheme were exchanged between Wells Fargo and/or Wells Fargo Bank and Balboa and National General by way of wire transfer.

CLASS ACTION COMPLAINT

### D.      The Predicate Acts of Mail and Wire Fraud

110.   The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.   Specifically, Wells Fargo and/or Wells Fargo Bank and Balboa and later National General engaged in an intentional scheme or artifice to defraud borrowers whose loans were serviced by Wells Fargo and/or Wells Fargo Bank and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

111.   The false statement and omissions, and mail and/or wire communications were made by Wells Fargo and/or Wells Fargo Bank and Balboa and National General in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

112.   It was reasonably foreseeable to Wells Fargo and/or Wells Fargo Bank and Balboa and National General that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

113.   The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions.   The precise dates of such transmissions cannot be alleged without access to the books and records of Wells Fargo and/or Wells Fargo Bank and Balboa and National General.   Nevertheless, Plaintiffs can allege such transmissions generally.

114.   For the purpose of furthering and executing the scheme, Wells Fargo and/or Wells Fargo Bank and Balboa and National General regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by private or commercial interstate carrier.   For example:

CLASS ACTION COMPLAINT

a)      Wells Fargo and/or Wells Fargo Bank and Balboa and National General issued materially false and misleading notices and billing statements relating to CPI to borrowers via mail and wires;

b)      Wells Fargo and/or Wells Fargo Bank and Balboa and National General also communicated to borrowers with respect to force-placed insurance issues by telephone;

c)      Wells Fargo and/or Wells Fargo Bank and Balboa and National General issued monthly statements via mail and/or wires falsely representing that borrowers were required to pay CPI charges;

d)      Wells Fargo and/or Wells Fargo Bank and/or Balboa and/or National General received illicit CPI payments from borrowers via mail and/or wire;

e)      Wells Fargo and/or Wells Fargo Bank transmitted a portion of the illicit CPI charges collected from borrowers to Balboa and/or National General via mail and/or wire; and

f)      Wells Fargo and/or Wells Fargo Bank and Balboa and National General utilized the mails and/or wires for the purpose of furthering and executing the scheme.  In certain cases, Wells Fargo Bank and Balboa and/or National General also issued standardized notices to borrowers.

115.   These letters contained both affirmative misrepresentations about the nature of the charges, and were also intended to deceive borrowers into believing that the charges assessed to their account were legitimate.

116.   Plaintiffs and other borrowers within the Classes also received standardized monthly billing statements from Wells Fargo and/or Wells Fargo Bank.  The identification of amounts charged to borrowers for CPI on these billing statements also played a role in furthering the overall scheme to defraud, as it allowed Wells Fargo and/or Wells Fargo Bank to collect unauthorized amounts from borrowers.

117.   These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Wells Fargo and/or Wells Fargo Bank and Balboa and National General.   Each electronic and/or postal transmission was incident to an essential part of the scheme.   As detailed above, Wells Fargo and/or Wells Fargo Bank and National General engaged in similar activities with respect to each member of the Classes.

118.   Each such electronic and/or postal transmission was incident to an essential part of the scheme.

119.   Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers.

120.   All Defendants participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers into paying and/or incurring falsely inflated, unauthorized charges in connection with force-placed insurance policies.

121.   The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).   The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to force-placed insurance and thereby enable Wells Fargo, Wells Fargo Bank, Balboa and National General to reap illicit profits.

122.   All Defendants participated in the predicate acts. These activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers.

### E.   Injury to Plaintiffs and the Classes

123.   As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the Classes have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs and the Classes paid and/or were

charged unauthorized insurance charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

124.   Plaintiffs and the Classes were also charged overdraft fees, and other amounts, after Wells Fargo and/or Wells Fargo Bank deducted the unlawful amounts from Plaintiff's accounts, and/or otherwise assessed charges that they were not entitled to collect.

125.   Moreover, overcharging Plaintiffs and the Classes for force-placed insurance was an integral and necessary part of the scheme, as those overcharges constituted purported servicing advances that Wells Fargo and/or Wells Fargo Bank were entitled to recoup from the proceeds of the loans.

126.   Under the provisions of 18 U.S.C. § 1964(c), Wells Fargo, Wells Fargo Bank, and National General are jointly and severally liable to Plaintiffs and the Classes for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## SECOND CLAIM

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D) – RICO CONSPIRACY ON BEHALF OF THE NATIONWIDE CLASS AND THE SUB-CLASS AGAINST ALL DEFENDANTS

127.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

128.   RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

129.   Wells Fargo has violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) with Wells Fargo Bank, Balboa, National General, Harp, and Katafias.

130.   As set forth in Count One, above, at all relevant times, Plaintiffs and the Classes were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

131.   As also set forth above, at all relevant times, defendants Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

132.   Wells Fargo, Wells Fargo Bank, National General, Balboa, Harp, and Katafias formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to force-placed insurance.   The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to force-placed insurance.

133.   The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

134.   As set forth in Count One, above, Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

135.   Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

136.   Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.

137.   As a direct and proximate result of the overt acts and predicate acts of in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Classes have been and are continuing to be injured in their business and property in an amount to be determined at trial.   Such injuries include, but are not limited

CLASS ACTION COMPLAINT

to, fraudulently inflated and unnecessary charges with respect to force-placed insurance, as a direct, proximate and foreseeable result of the scheme alleged herein.

138.   Under the provisions of 18 U.S.C. § 1964(c), Wells Fargo, Wells Fargo Bank, Balboa, National General, Harp, and Katafias are jointly and severally liable to Plaintiffs and the Classes for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## THIRD CLAIM

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, ET SEQ. ON BEHALF OF THE NATIONWIDE CLASS AGAINST WELLS FARGO, WELLS FARGO BANK, HARP AND KATAFIAS

139.   Plaintiffs incorporate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

140.   Plaintiffs bring their § 17200 claim on behalf of themselves and all borrowers who were unlawfully (1) charged and/or paid for lender-placed auto collateral protection insurance policies that they did not need, and (2) charged and/or paid for fees and interest in connection with the unnecessary auto collateral protection insurance policies; and/or (3) paid for lender-placed auto collateral protection insurance policies that included the costs of commission payments.

141.   Defendants were required to adhere to the requirements of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"), when conducting business with Plaintiffs and members of the Classes.

142.   The UCL reaches claims made by out-of-state residents harmed by unlawful conduct occurring inside California.

143.   Moreover, these principal decision makers, including Harp and Katafias, conceived of and managed the CPI scheme out of their California offices.  Wells Fargo and/or Wells Fargo Bank's operations in California were the locus of the decisions (and/or

ratification of decisions) to enter into agreements with Balboa and National General to force-place auto collateral protection insurance on borrowers throughout the United States with Balboa Insurance or National General Insurance that generated commissions in the form of monetary and/or nonmonetary remuneration to Defendants. Moreover, the ability to force-place insurance on members of the Classes resided with Wells Fargo Bank in Irvine, California, who additionally communicated with members of the Class regarding their supposed auto loan delinquencies out of their Santa Ana, California office.

144.   The UCL prohibits any "unlawful" business act or practice. Defendants have violated the UCL's prohibition against engaging in unlawful acts or practices by violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

145.   Plaintiffs reserve the right to allege other violations of law that constitute other unlawful business acts or practices.

146.   The UCL also prohibits any "unfair" business act or practice. As detailed in the preceding paragraphs, Defendants engaged in unfair business acts or practices by, among other things, (1) charging borrowers for unwanted and unnecessary auto collateral protection insurance premiums; (2) charging borrowers for auto collateral protection insurance premiums that included the cost of commissions paid to Defendants; and/or (2) reaping financial benefits at the expense of Plaintiffs and the Classes, including fees from overdrawn bank accounts, for those borrowers' whose auto loan payments were automatically deducted from their checking or savings accounts, as well as additional fees and charges assessed to customers after reporting their delinquency on credit reports.

147.   Defendants systematically engaged in these unfair and unlawful business practices to the detriment of Plaintiffs and other members of the Classes.

148.   The harm caused by these business practices vastly outweighs any legitimate business utility they could possibly have.

149.   There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

150.    Plaintiffs and other members of the Classes have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.  Plaintiffs are entitled to restitution in an amount to be determined at trial.

151.    As a result of Defendant's violations of the UCL, Plaintiffs are also entitled to recover attorneys' fees and costs to be paid by Defendants, as provided by Cal. Code of Civil Procedure § 1021.5 and other applicable law.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendant and in favor of Plaintiffs, the Class, and Texas Sub-Class, and award the following relief:

a.      that this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Texas Sub-Class, and Plaintiffs' counsel as counsel for the Class and Texas Sub-Class;

b.      that the conduct herein be declared, adjudged and decreed to be unlawful;

c.      award Plaintiffs and members of the Classes appropriate relief, including actual damages, statutory damages, treble damages, punitive damages, and restitutionary disgorgement;

d.      award all costs of prosecuting the litigation, including expert fees;

e.      award pre- and post-judgment interest;

f.      award attorneys' fees; and

g.      grant such additional relief as this Court may deem just and proper.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: August 14, 2017

Respectfully submitted,

**ROSMAN & GERMAIN LLP**

*/s/ Daniel L. Germain*
DANIEL L. GERMAIN (Bar #143334)
Germain@lalawyer.com
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

KESSLER TOPAZ
MELTZER & CHECK, LLP

JENNIFER L. JOOST (CA Bar No. 296164)
(admission application forthcoming)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

JOSEPH H. MELTZER
(*pro hac vice* application forthcoming)
jmeltzer@ktmc.com
PETER A. MUHIC
(*pro hac vice* application forthcoming)
pmuhic@ktmc.com
TYLER S. GRADEN
(*pro hac vice* application forthcoming)
tgraden@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller
(*pro hac vice* application forthcoming)
epm@millerlawpc.com
Sharon S. Almonrode
(*pro hac vice* application forthcoming)
ssa@millerlawpc.com
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852


*Attorneys for Plaintiffs and the Proposed
Classes*

CLASS ACTION COMPLAINT

# EXHIBIT A



Newsroom    News Releases    Wells Fargo Announces Plan to Remediate Customers for Auto Insu...

# Wells Fargo Announces Plan To Remediate Customers For Auto Insurance Coverage

*Company commits to consumer relief as part of resolving self-identified issue*

Posted In: Consumer Lending, Corporate and Financial
July 27, 2017

SAN FRANCISCO--(BUSINESS WIRE)--Wells Fargo & Company (NYSE: WFC) today announced a plan to remediate auto loan customers of Wells Fargo Dealers Services who may have been financially harmed due to issues related to auto Collateral Protection Insurance (CPI) policies.

Wells Fargo reviewed policies placed between 2012 and 2017 and identified approximately 570,000 customers who may have been impacted and will receive refunds and other payments as compensation. In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in remediation. Starting in August 2017, Wells Fargo will proactively reach out to impacted customers with letters and refund checks.

"In the fall of last year, our CEO and our entire leadership team committed to build a better bank and be transparent about those efforts," said Franklin Codel, head of Wells Fargo Consumer Lending, which includes the Dealer Services unit. "Our actions over the past year show we are acting on this commitment."

Customers' auto loan contracts require them to maintain comprehensive and collision physical damage insurance on behalf of the lender throughout the term of the loan. As permitted under those contracts, Wells Fargo would purchase CPI from a vendor on the customer's behalf if there was no evidence — either from the customer or the insurance company — that the customer already had the required insurance. CPI insurance protects against loss or damage to a vehicle serving as collateral to secure a loan and helps ensure that borrowers can pay for damages to a vehicle.

In response to customer concerns, in July 2016 Wells Fargo initiated a review of the CPI program and related third-party vendor practices. Based on the initial findings, the company discontinued its CPI program in September 2016. Since then, the company has gone through a comprehensive review using independent consultants to ensure the remediation plan it develops addresses customers' situations in a thorough and thoughtful way.

Wells Fargo's review determined that certain external vendor processes and internal controls were inadequate. As a result, customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.

"We take full responsibility for our failure to appropriately manage the CPI program and are extremely sorry for any harm this caused our customers, who expect and deserve better from us," said Codel. "Upon our discovery, we acted swiftly to discontinue the program and immediately develop a plan to make impacted customers whole."

Wells Fargo already has been providing CPI-related refunds to some customers and, beginning in August, will send letters and refund checks to customers who are due additional payments. The process is expected to be complete by the end of the year and is as follows:

- Approximately 490,000 customers had CPI placed for some or all of the time they had adequate vehicle insurance coverage of their own. We refunded the premium and interest for the duplicative coverage at the time the customer made us aware of their other insurance. These customers will receive additional refunds of certain fees and some additional interest. Refunds for this group total approximately $25 million.

- In five states that have specific notification and disclosure requirements, approximately 60,000 customers did not receive complete disclosures from our vendor as required prior to CPI placement. In these cases, even if CPI was required, customers will receive a refund including premiums, fees and interest. Refunds for this group total approximately $39 million.

- For approximately 20,000 customers, the additional costs of the CPI could have contributed to a default that resulted in the repossession of their vehicle. Those customers will receive additional payments as compensation for the loss of their vehicle. The payment amount will depend on each customer's situation and also will include payment above and beyond the actual financial harm as an expression of our regret for the situation. Refunds for this group total approximately $16 million.

For each of these categories, Wells Fargo will also work with the credit bureaus to correct customers' credit records, if applicable. Also as an outcome of this review, Wells Fargo has taken additional steps to tighten oversight of third-party

## Newsroom

News Releases
Company Overview
Financial Information
Multimedia Resources
Wells Fargo Stories
Corporate Social Responsibility
Advanced Search

vendors in Dealer Services. This is consistent with a broader effort to strengthen how the Dealer Services business manages risk and serves customers, which has included other recently announced actions to centralize operational functions and provide more consistency for customers, tighten credit standards, and implement a new structure.

**About Wells Fargo**

Wells Fargo & Company (NYSE: WFC) is a diversified, community-based financial services company with $1.9 trillion in assets. Wells Fargo's vision is to satisfy our customers' financial needs and help them succeed financially. Founded in 1852 and headquartered in San Francisco, Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,500 locations, 13,000 ATMs, the internet (wellsfargo.com) and mobile banking, and has offices in 42 countries and territories to support customers who conduct business in the global economy. With approximately 271,000 team members, Wells Fargo serves one in three households in the United States. Wells Fargo & Company was ranked No. 25 on Fortune's 2017 rankings of America's largest corporations. News, insights and perspectives from Wells Fargo are also available at Wells Fargo Stories.

**Cautionary Statement About Forward-Looking Statements**

This news release contains forward-looking statements about our future financial performance and business. Because forward-looking statements are based on our current expectations and assumptions regarding the future, they are subject to inherent risks and uncertainties. Do not unduly rely on forward-looking statements as actual results could differ materially from expectations. Forward-looking statements speak only as of the date made, and we do not undertake to update them to reflect changes or events that occur after that date. For information about factors that could cause actual results to differ materially from our expectations, refer to our reports filed with the Securities and Exchange Commission, including the discussion under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016, as filed with the Securities and Exchange Commission and available on its website at www.sec.gov.

**Contact:**

**Media**
Catherine Pulley, 646-634-6515
or
**Investors**
Jim Rowe, 415-396-8216

‡ We provide links to external websites for your convenience. Wells Fargo does not endorse and is not responsible for their content, links, privacy policies, or security policies.

© 1999 - 2017 Wells Fargo. All rights reserved. NMLSR ID 399801

Business Wire NewsHQ℠

# EXHIBIT B

Case 8:17-cv-01395-AG-KES Document 20 Filed 08/14/17 Page 42 of 96 Page ID #:421

*The New York Times*

BUSINESS DAY

# Wells Fargo Forced Unwanted Auto Insurance on Borrowers

By GRETCHEN MORGENSON    JULY 27, 2017

More than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need, and some of them are still paying for it, according to an internal report prepared for the bank's executives.

The expense of the unneeded insurance, which covered collision damage, pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions, according to the 60-page report, which was obtained by The New York Times. Among the Wells Fargo customers hurt by the practice were military service members on active duty.

Wells Fargo, one of the largest banks in the United States, is struggling to repair its image after a scandal in which its employees created millions of credit card and bank accounts that customers had never requested. That crisis, which came to a head last year, toppled Wells Fargo's chief executive and led to millions of dollars in fines.

9

**ARTICLES REMAINING**

SEE MY OPTIONS       Subscriber login

The bank also stands accused of having made improper adjustments to the terms of the home loans of customers who were in bankruptcy, which Wells Fargo denies.

Asked about the findings on auto insurance, Wells Fargo officials confirmed that the improper insurance practices took place and said the bank was determined to make customers whole.

"We have a huge responsibility and fell short of our ideals for managing and providing oversight of the third-party vendor and our own operations," Franklin R. Codel, the head of consumer lending at Wells Fargo, said in an interview. "We self-identified this issue, and we made the right business decisions to end the placement of the product."

The report, which was prepared by the consulting firm Oliver Wyman, looked at insurance policies sold to Wells customers from January 2012 through July 2016. The insurance, which the bank required, was more expensive than auto insurance that customers often already had obtained on their own.

National General Insurance underwrote the policies for Wells Fargo, which began to require the insurance on auto loans as early as 2006. The practice continued until the end of September.

Christine Worley, a spokeswoman for National General, declined to comment.

For borrowers, delinquencies arose quickly because of the way the bank charged for the insurance. Say, for example, that a customer agreed to a monthly payment of $275 in principal and interest on her car loan, and arranged for the amount to be deducted from her bank account automatically. If she were not advised about the insurance and it increased her monthly payment to, say, $325, her account could become overdrawn as soon as Wells Fargo added the coverage.

The report tried to determine how many Wells Fargo customers were hurt and how much they should be compensated. It estimated that the bank owed $73 million to wronged customers.

9

ARTICLES REMAINING

SEE MY OPTIONS          Subscriber login

State insurance regulations required Wells Fargo to notify customers of the insurance before it was imposed. But the bank did not always do so, the report said. And almost 100,000 of the policies violated the disclosure requirements of five states — Arkansas, Michigan, Mississippi, Tennessee and Washington.

Wells Fargo took issue with some of the figures in its own report. In a statement, Jennifer A. Temple, a bank spokeswoman, said the bank determined only 570,000 of its customers may qualify for a refund and that just 60,000 customers in the five states had not received complete disclosures before the insurance placement. Finally, she said, the bank estimated the insurance may have contributed to 20,000 wrongful repossessions, not 25,000.

"We take full responsibility for these errors and are deeply sorry for any harm we caused customers," Ms. Temple added.

Requiring borrowers to be insured is common in the mortgage arena, where banks expect customers to carry enough homeowners' insurance to protect the property backing their loans. The term for the practice is "lender-placed insurance." Pressing such insurance on auto borrowers, however, is not as common: Representatives of Bank of America, Citibank and JPMorgan Chase said they did not offer the policies, though some smaller banks do.

In the Wells Fargo arrangement, National General receives all of the commissions on the insurance it sold to the bank's borrowers. But for a time the bank shared in those revenues. Wells stopped sharing in the commissions in February 2013, according to the report.

Asked about the bank's insurance practices, Bryan Hubbard, a spokesman for the Office of the Comptroller of the Currency, Wells Fargo's regulator, said, "I cannot comment on specific ongoing supervisory matters or potential pending actions pertaining to a particular bank."

Wells Fargo borrowers sustained financial damages beyond the costs of the insurance, the report said. The harm also included repossession costs, late fees, charges for insufficient funds and damage to consumers' credit reports.

9
ARTICLES REMAINING

SEE MY OPTIONS        Subscriber login

In recent years, consumers have complained to federal regulators about lender-placed insurance on auto loans, the Consumer Financial Protection Bureau's database shows. Many complaints identified Wells Fargo. In one example, an unidentified Wells Fargo customer reported providing proof to the bank on three occasions that the car was already insured and the new insurance was unnecessary, only to continue receiving calls from bank employees demanding payment of insurance charges.

Wells Fargo automatically imposed the insurance through its Dealer Services unit. Its website says it has more than four million customers and provides a variety of banking services to 14,000 auto dealers around the nation. It says the company's lender-placed auto insurance "may be considerably more expensive than insurance you can obtain on your own."

Such policies typically cost more than $1,000 a year, not counting interest. (Customers could pay them in full or finance them over time.) If a car was repossessed, the bank might charge a reinstatement fee of as much as $500, so a borrower could face $1,500 in charges.

Here is how the process worked: When customers financed cars with Wells Fargo, the buyers' information would go to National General, which was supposed to check a database to see if the owner had insurance coverage. If not, the insurer would automatically impose coverage on the customers' accounts, adding an extra layer of premiums and interest to their loans.

When customers who checked their bills saw the charges and notified Wells Fargo that they already had car insurance, the bank was supposed to cancel the insurance and credit the borrower with the amount that had been charged.

The Oliver Wyman report indicated that many customers appear not to have notified Wells Fargo of the redundant insurance. This may have been because their payments were deducted automatically from their bank accounts and they did not spot the charges.

9   According to documents on a Wells Fargo website titled "understanding your
ARTICLE auto loan," the bank had strict rules about the order in which it would apply a

SEE MY OPTIONS          Subscriber login

customer's car payment to costs associated with the loan: First to be deducted from a payment would be the interest owed on the car loan. Then the bank would deduct interest charged on the lender-placed insurance. The third deduction would be principal on the loan, followed by the amount of premium owed on the insurance.

This payment structure had the effect of increasing the overall interest borrowers paid on their loans, the Oliver Wyman report noted, because fewer dollars went to reducing the principal outstanding.

Wells Fargo was also aggressive in repossessing vehicles: Some customers endured multiple repossessions, the report said.

Last fall, Wells Fargo Dealer Services had a run-in with regulators, and it agreed to pay $4 million in a settlement with the Justice Department over illegally repossessing cars of military service members. Since that settlement, three top executives have left the Dealer Services division.

A version of this article appears in print on July 28, 2017, on Page A1 of the New York edition with the headline: Wells Fargo Required Borrowers To Buy Needless Auto Insurance.

© 2017 The New York Times Company

9
ARTICLES REMAINING

SEE MY OPTIONS        Subscriber login

# EXHIBIT C

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                        Thursday, September 29, 2016

## Justice Department Reaches $4 Million Settlement with Wells Fargo Dealer Services for Illegally Repossessing Servicemembers' Cars

The Justice Department announced today that Wells Fargo Bank N.A., doing business as Wells Fargo Dealer Services, has agreed to change its policies and pay over $4.1 million to resolve allegations that it violated the Servicemembers Civil Relief Act (SCRA) by repossessing 413 cars owned by protected servicemembers without obtaining a court order.

The settlement, which is still subject to court approval, was filed in the U.S. District Court for the Central District of California.  The department launched an investigation after it received a complaint in March 2015 from the U.S. Army's Legal Assistance Program alleging that Wells Fargo had repossessed Army National Guardsman Dennis Singleton's used car in Hendersonville, North Carolina, while he was preparing to deploy to Afghanistan to fight in Operation Enduring Freedom.  After Wells Fargo repossessed the car, it sold it at a public auction and then tried to collect a deficiency balance of over $10,000 from Singleton and his family.  In October 2014, while seeking assistance with debt consolidation, Army National Guardsman Singleton met with a National Guard attorney, who informed him of his rights under the SCRA.  The attorney requested information from Wells Fargo about the original loan and repossession, and asked for copies of the correspondence and payment history.  The attorney never received a response from Wells Fargo.  The department's subsequent investigation corroborated Singleton's complaint and found a pattern of unlawful repossessions spanning over more than seven years.

"Wells Fargo Bank unlawfully repossessed hundreds of servicemembers' cars without the proper process, and the bank will now rightfully pay for its violations," said Principal Deputy Associate Attorney General Bill Baer.  "The Justice Department is committed to protecting our country's servicemembers as they continue to fight for our freedom."

"Auto lenders cannot repossess the cars of the brave men and women who risk their lives to defend our freedom without providing them the required legal protections under the SCRA," said Principal Deputy Assistant Attorney General Vanita Gupta, head of the Justice Department's Civil Rights Division.  "I commend Wells Fargo for owning up to its shortcomings and providing all the information we requested after learning of our investigation.  This settlement should help ensure that servicemembers are not penalized financially for protecting our nation."

"We all have an obligation to ensure that the women and men who serve our country in the Armed Forces are afforded all of the rights they are due," said U.S. Attorney Eileen M. Decker of the Central District of California.  "Wells Fargo failed in that obligation.  The settlement announced today, however, vindicates the rights of our servicemembers and will help ensure better lending practices in the future by one of the nation's largest motor vehicle lenders."

The SCRA protects servicemembers against certain civil proceedings that could affect their legal rights while they are in military service.  It requires a court to review and approve any repossession if the servicemember took out the loan and made a payment before entering military service.  The court may delay the repossession or require the lender to refund prior payments before repossessing.  The court may also appoint an attorney to represent the servicemember, require the lender to post a bond with the court and issue any other orders it deems necessary to protect the servicemember.  By failing to obtain court orders before repossessing motor vehicles owned by protected servicemembers, Wells Fargo prevented servicemembers from obtaining a court's review of whether their repossessions should be delayed or adjusted to account for their military service.

The settlement covers repossessions that occurred between Jan. 1, 2008 and July 1, 2015.  The agreement requires Wells Fargo to pay $10,000 to each of the affected servicemembers, plus any lost equity in the vehicle with interest.  Wells Fargo also must repair the credit of all affected servicemembers.  Wells Fargo sent payments to many of the affected servicemembers in August 2016.  Wells Fargo will locate additional victims and distribute payments through this settlement in the upcoming months, at no cost to the servicemembers.  The agreement also requires Wells Fargo to pay a $60,000 civil penalty to the United States and to determine, in the future, whether any vehicle it is planning to repossess is owned by an active duty servicemember.  If so, Wells Fargo will not repossess the vehicle without first obtaining a court order.  The agreement also contains provisions ensuring that all eligible servicemembers will receive the benefit of the SCRA's six percent interest rate cap on their auto loans.

The department's enforcement of the SCRA and other fair lending laws is conducted by the Civil Rights Division's Housing and Civil Enforcement Section.  Since 2010, the division has provided over $1.5 billion in monetary relief for individual borrowers and affected communities through its enforcement of the Fair Housing Act, the Equal Credit Opportunity Act and the SCRA.  The SCRA provides protections for active duty servicemembers in areas such as evictions, rental agreements, security deposits, prepaid rent, civil judicial proceedings, installment contracts, credit card interest rates, mortgage interest rates, mortgage foreclosures, automobile leases, life insurance, health insurance and income tax payments.  For more information about the department's SCRA enforcement, please visit www.servicemembers.gov. Servicemembers and their dependents who believe that their rights under SCRA have been violated should contact the nearest Armed Forces Legal Assistance Program Office.  Office locations may be found at legalassistance.law.af.mil/content/locator.php.

Wells Fargo Complaint

Wells Fargo Consent Order

---

**Topic(s):**
Civil Rights
Servicemembers Initiative

**Component(s):**
Civil Rights Division
Civil Rights - Housing and Civil Enforcement Section
Office of the Associate Attorney General
USAO - California, Central

**Press Release Number:**
16-1127

*Updated September 29, 2016*

# EXHIBIT D

1 LORETTA E. LYNCH
  Attorney General
2 VANITA GUPTA
  Principal Deputy Assistant Attorney General
3 SAMEENA SHINA MAJEED
  Chief, Housing and Civil Enforcement Section
4 ELIZABETH A. SINGER
  Director, U.S. Attorneys' Fair Housing Program
5 NICOLE M. SIEGEL
  DANIEL P. MOSTELLER
6 Trial Attorneys
        U.S. Department of Justice
7       Civil Rights Division
        Housing and Civil Enforcement Section
8       950 Pennsylvania Ave. NW – NWB
        Washington, D.C. 20530
9       Telephone: (202) 514-4713
        Facsimile: (202) 514-1116
10      Email: daniel.mosteller@usdoj.gov

11 EILEEN M. DECKER
   United States Attorney
12 DOROTHY A. SCHOUTEN
   Assistant United States Attorney
13 Chief, Civil Division
   JOANNA HULL (CA State Bar No. 227153)
14 Assistant United States Attorney
   Chief, Civil Rights Section, Civil Division
15      Federal Building, Suite 7516
        300 North Los Angeles Street
16      Los Angeles, California 90012
        Telephone: (213) 894-6585
17      Facsimile: (213) 894-7819
        E-mail: Joanna.Hull@usdoj.gov

18
19 Attorneys for Plaintiff
   United States of America

20          UNITED STATES DISTRICT COURT

21     FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 22 UNITED STATES OF AMERICA, | No. CV 2:16-07336 |
| 23                 Plaintiff | |
| 24                 v. | **CONSENT ORDER** |
| 25 WELLS FARGO BANK, N.A. | |
|    d/b/a | |
| 26 WELLS FARGO DEALER SERVICES | |
| 27                 Defendant. | |
| 28 | |

**CONSENT ORDER**

## I. INTRODUCTION

1.  This Consent Order resolves the allegations contained in the United States'
    Complaint that Defendant Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer
    Services ("Wells Fargo") violated the Servicemembers Civil Relief Act
    ("SCRA"), 50 U.S.C. § 3901, *et seq.*, when, according to the allegations, it
    engaged in a pattern or practice of repossessing motor vehicles from "SCRA-
    protected servicemembers"[1] without court orders from at least January 1,
    2008 through July 1, 2015.

2.  Defendant is a national bank whose motor vehicle lending operations are
    located at 23 Pasteur in Irvine, California, in the Central District of
    California.

3.  This Order covers all loans or deficiency balances originated, acquired,
    and/or serviced by Defendant, its parent Wells Fargo & Company, or any of
    their subsidiaries, predecessors, acquired companies, or successor entities.
    For purposes of this Order, loans are defined to include retail installment
    contracts for motor vehicles.

4.  Wells Fargo has cooperated fully with the United States' investigation in this
    matter and had taken steps to ensure its compliance with the SCRA, prior to
    this investigation. Wells Fargo established a centralized SCRA Center of
    Excellence that focuses specifically on SCRA compliance.  The SCRA
    Center of Excellence employs a proactive approach to identifying
    servicemembers for SCRA protection. Wells Fargo initiated such efforts in
    the second quarter of 2014 with a full-scale review of its portfolio for SCRA

---

[1] For purposes of this Consent Order, the term "SCRA-protected servicemember"
includes servicemembers as defined in 50 U.S.C. § 3911(1) and (2).

1

compliance.  In addition, Wells Fargo previously and voluntarily commenced efforts to compensate any affected borrowers.

5.  The parties agree that the Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 50 U.S.C. § 4041.

6.  The parties agree that, to avoid costly and protracted litigation, the claims against Defendant should be resolved without further proceedings or an evidentiary hearing.  Therefore, as indicated by the signatures appearing below, the United States and Defendant agree to the entry of this Order.  Such agreement comes without the taking of proof and does not constitute evidence or findings against or an admission of any party regarding any issue of law or fact alleged in the Complaint.  Defendant neither admits nor denies any of the allegations in the United States' Complaint.

7.  The effective date of this Order will be the date on which it is approved and entered by the Court.

//

## It is hereby ORDERED, ADJUDGED and DECREED:
## II. REMEDIAL PROVISIONS[2]

8.  Defendant and its affiliates or subsidiaries, and its officers, employees, agents, and representatives (including contractors and vendors that conduct repossessions on behalf of Defendant) shall comply fully with all relevant provisions of the SCRA prohibiting the repossession of motor vehicles of SCRA-protected servicemembers without a court order, while the servicemember is in military service[3], provided the servicemember paid a

---

[2] Nothing in this Consent Order shall preclude Defendant from offering greater protections to servicemembers than those afforded by the Consent Order or the SCRA.

[3] For purposes of this Consent Order, the term "military service" is defined by 50 U.S.C. § 3911(2).

2

deposit on the motor vehicle or installment on the loan while not in military service.[4]

### III. COMPLIANCE WITH THE SCRA
### AND SCRA POLICIES AND PROCEDURES

9.  Within sixty (60) calendar days of the effective date of this Order, Defendant shall continue to develop SCRA Policies and Procedures for Motor Vehicle Repossessions in compliance with Section 3952(a) of the SCRA, 50 U.S.C. § 3952(a).[5] These policies and procedures must include provisions that ensure:

a.  In addition to any other reviews Defendant may perform to assess eligibility under the SCRA, (i) between two (2) and five (5) business days before it refers a motor vehicle loan for repossession; (ii) between two (2) and five (5) business days after it (or its agents, including contractors and vendors that conduct repossessions on behalf of Defendant) obtains possession of the motor vehicle; and (iii) between two (2) and five (5) business days before it (or its agents, including contractors and vendors that conduct repossessions on behalf of Defendant) disposes of the motor vehicle, Defendant will determine whether borrowers are servicemembers in military service who paid a deposit on the motor vehicle or installment on the loan while not in military service by: (1) reviewing any military service information (including orders) it has received from borrowers and (2)

---

[4] 50 U.S.C. § 3917 grants additional periods of protection for reservists ordered to report for military service and persons ordered to report for induction. Therefore, for purposes of this Consent Order, periods of protection granted by 50 U.S.C. § 3917 shall be considered "military service" at the time of repossession, but shall not be considered "military service" at the time of payment of a deposit on the motor vehicle or installment on the loan.

[5] Because Defendant's motor vehicle lending contracts do not obtain a security interest in the nature of a mortgage, which are subject to the requirements of Section 3953 of the SCRA, this Consent Order is limited to compliance with Section 3952(a) of the SCRA, which covers installment contracts.

3

searching the Department of Defense Manpower Data Center database ("DMDC") for evidence of SCRA eligibility by either (a) last name and social security number or (b) last name and date of birth.

b.    If Defendant is informed via military service information received from a borrower, or via the periodic electronic check of the DMDC described above, that the borrower is a servicemember in military service who paid a deposit on the motor vehicle or installment on the loan while not in military service, it may refer the loan for repossession or conduct the repossession itself only after obtaining a court order.

c.    If Defendant discovers, after obtaining possession but before disposing of the motor vehicle, that the borrower is a servicemember in military service who paid a deposit on the motor vehicle or installment on the loan while not in military service, Defendant shall attempt to contact the borrower and offer to arrange to return the vehicle as soon as possible, but within no later than seventy-two (72) hours, and shall reverse on the borrower's account all of the charges resulting from the repossession.  Defendant shall also correct any negative credit reporting related to the repossession.  If Defendant cannot make contact with the borrower within seventy-two (72) hours, Defendant shall cause the vehicle to be returned to the location where possession was taken, unless: (1) return to such location presents a significant risk of damage to the vehicle; (2) return to such location presents a significant risk that the vehicle will be impounded; (3) the borrower has previously informed Defendant that the vehicle has been abandoned; or (4) the vehicle was recovered

4

under circumstances suggesting that the vehicle had been abandoned. If the vehicle is not returned to the borrower within seventy-two (72) hours, Defendant shall make 3 additional attempts to reach the borrower based upon contact information in its files, and return the vehicle as soon as possible, but within no later than seventy-two (72) hours, of a borrower's request for return, without charging storage fees. The vehicle may only be sold or otherwise disposed of only after the contact attempts referenced in this subparagraph have been made.

d.  If Defendant pursues a repossession action in court and the borrower fails to answer the action, Defendant will file an affidavit of military service with the court as required by Section 3931(b)(1) of the SCRA, 50 U.S.C. § 3931(b)(1). Before seeking entry of default, Defendant will search the DMDC and review information in its possession or control to determine if the borrower is SCRA-protected. If Defendant learns that the borrower is SCRA-protected, Defendant will: (1) file an affidavit stating that "the defendant is in military service" before seeking default judgment; and (2) attach the most recent military status report from the DMDC or a copy of the military orders or other documentation to the affidavit.

e.  Defendant may only rely on a servicemember's waiver of rights under Section 3952(a) of the SCRA if it obtains a written agreement as provided in Section 3918 of the SCRA, 50 U.S.C. § 3918. If Defendant makes an unsolicited initiation of the waiver process with the servicemember, it must do so at least thirty (30) calendar days in advance of any anticipated repossession by sending a notice and a copy of the proposed waiver to the servicemember. To the extent

5

Defendant exercises this right, Defendant shall use a notice that prominently incorporates the language and layout of the form attached as Exhibit A. If the servicemember initiates the waiver process by offering to voluntarily surrender the vehicle or indicating an intent to abandon the vehicle, Defendant must provide a copy of the notice of the type described in Exhibit A and may obtain possession of the vehicle at any point after receiving a signed waiver.

f. Defendant may take possession of a motor vehicle that has been impounded by a non-related third-party or abandoned[6] upon receiving notice of the impoundment or abandonment even when the borrower is a servicemember in military service who paid a deposit on the motor vehicle or installment on the loan while not in military service. Defendant must, however, provide notice to the servicemember that it has taken possession and inform the servicemember of the rights and protections under the SCRA, using a notice that prominently incorporates the language and layout of the form attached as Exhibit A. Defendant may dispose of the vehicle only after such notice and any notice required by state law have been provided and at least thirty (30) calendar days have passed.

10. Within sixty (60) calendar days of the effective date of this Order, Defendant shall continue to develop SCRA Policies and Procedures for Providing SCRA Relief in its motor vehicle lending line of business. This includes, but is not

---

[6] To be considered "abandoned" under this Order, the motor vehicle must have been left someplace other than the servicemember's residence or residential parking area, with indications of no intent to retrieve it.

6

limited to, policies regarding reducing interest rates under Section 3937.[7]
The Policies and Procedures shall contain the following provisions:

   a.   Defendant shall accept servicemembers' notice of military status
        pursuant to the SCRA (including provisions of the SCRA that require
        notice in order to receive relief) made via facsimile, United States
        Postal Service First Class Mail (postage pre-paid), overnight mail, or
        electronically.

   b.   Defendant shall designate customer service representatives who have
        been specifically trained on the protections of the SCRA and who are
        responsible for the intake of and response to servicemembers'
        inquiries regarding the SCRA.  Defendant shall ensure that it has a
        designated telephone number, and electronic mail address, at which
        servicemembers may reach the designated SCRA customer service
        representatives, who will address questions or concerns regarding
        relief pursuant to the SCRA.  Defendant shall also include a page on
        its website detailing eligibility for, and relief provided by, the SCRA,
        and providing the designated telephone number and electronic mail
        address to obtain SCRA relief, or raise questions or concerns
        regarding such relief.

   c.   When Defendant receives notice from a servicemember of military
        status pursuant to the SCRA, within sixty (60) calendar days, it shall
        review all the servicemember's loans, regardless of type of
        obligation, even if it is outside the motor vehicle lending line of
        business, and it shall determine the servicemember's eligibility for all
        forms of relief pursuant to the SCRA on all loans.  If the

---

[7] The SCRA Policies and Procedures for Providing SCRA Relief need not include early termination of leases under Section 3955 so long as Defendant is not the business of leasing motor vehicles.

1  servicemember is determined to be eligible, the relief will be applied

2  retroactively to the first day of eligibility.

3      d.    Within twenty (20) business days after determining a

4  servicemember's eligibility for relief pursuant to the SCRA,

5  Defendant shall notify the servicemember in writing[8] of its

6  determination.  If Defendant grants relief, Defendant shall notify the

7  servicemember in writing of the specific terms of the relief provided.

8  If Defendant denies relief, Defendant shall also notify the

9  servicemember in writing of the reason(s) for the denial, and it shall

10  ensure that such servicemember is given an opportunity to provide

11  additional documentation or information to establish eligibility for

12  relief pursuant to the SCRA.

13      e.    With respect to forms of relief for which the SCRA requires

14  provision of military orders, in the event that a servicemember fails to

15  provide a copy of military orders entitling him or her to the relief,

16  Defendant shall search the DMDC to confirm eligibility.  If the

17  DMDC records provide dates of service that confirm eligibility,

18  Defendant shall provide the relief required by the SCRA for the dates

19  indicated by the DMDC and shall notify the servicemember that the

20  servicemember may submit additional documentation to establish

21  eligibility dates if the servicemember disagrees with the dates

22  provided by the DMDC.  If the DMDC records do not confirm

[8] For all written notices to servicemembers required by the Consent Order, Defendant shall use either: (1) the email address or mailing address chosen by the borrower as the primary means of communication either by previous election or in the most recent communication with the Defendant; or (2)  if, no primary means of communication has been chosen, the mailing and e-mail address listed in the servicemember's most recent communication with Defendant, in addition to the servicemember's current mailing address in Defendant's servicing records (if different).

8

eligibility, Defendant may deny the relief if it informs the servicemember in writing that he or she is not eligible for the relief unless he or she provides a copy of documents establishing military service.  Such documents will include any document prepared exclusively by a branch of the military, the Department of Defense, or a borrower's commanding officer that indicates that the borrower is on active duty (e.g., active duty orders, change of station orders, DD-214 forms, letters from commanding officers, etc.).  Defendant shall request this additional information before making a final determination that the servicemember is not eligible for relief.

f.  Defendant shall accept military orders without requiring a specific end date for the period of military service.  Defendant also shall accept military orders without requiring the specification of the date upon which the servicemember first entered active duty for this period of service.

g.  Defendant shall provide SCRA relief beginning on the earliest eligible date provided in the orders or by the DMDC.  However, if the earliest date provided indicates that the servicemember was on active duty at the time of loan origination, Defendant shall notify the servicemember that he or she has been declined for the protection, but shall provide the servicemember a reasonable opportunity to provide documentation showing that the servicemember was not on active duty at the time of loan origination.

h.  Defendant shall be permitted to discontinue relief granted pursuant to the SCRA only after Defendant searches the DMDC and the DMDC reports that the servicemember is not in military service (or in any

9

SCRA-protected period after the termination of military service).[9] Defendant shall notify the servicemember in writing of the discontinuation, and it shall ensure that such servicemember is given an opportunity to provide additional documentation or information to reestablish eligibility for relief pursuant to the SCRA.  Defendant may choose to provide relief for a longer period than is required by this subparagraph.

    i.    The Policies and Procedures required by this Paragraph do not excuse Defendant from providing, or allow Defendant to delay providing, forms of relief for which the SCRA does not require a notification from a servicemember.  For example, the Policies and Procedures required by this Paragraph do not affect the timing requirement of Paragraph 9.

11.    No later than sixty (60) calendar days after the effective date of this Order, Defendant shall provide a copy of the proposed SCRA Policies and Procedures required under Paragraphs 9 and 10 to counsel for the United States.[10]  The United States shall respond to Defendant's proposed SCRA Policies and Procedures within forty-five (45) calendar days of receipt.  If the United States objects to any part of Defendant's SCRA Policies and Procedures, the parties shall confer to resolve their differences.  If the parties cannot resolve their differences after good faith efforts to do so, either party

---

[9] In the case where an SCRA-protected servicemember provides Defendant with valid military orders that include an end date of military service inconsistent with that appearing in the DMDC, Defendant may only discontinue the relief after the latter of the two end dates has expired or it obtains confirmation from the borrower that he or she has ended military service.

[10] All materials required by this Consent Order to be sent to counsel for the United States shall be sent by commercial overnight delivery addressed as follows: Chief, Housing and Civil Enforcement Section, Civil Rights Division, U.S. Department of Justice, 1800 G Street, N.W., 7th Floor, Washington, DC 20006, Attn: DJ 216-12C-2.

1    may bring the dispute to this Court for resolution.  Defendant shall begin the
2    process of implementing the SCRA Policies and Procedures within ten (10)
3    calendar days of approval by the United States or the Court.

4  12.  If, at any time during the term of this Order, Defendant proposes to materially
5    change its SCRA Policies and Procedures described herein, it shall first
6    provide a copy of the proposed changes to counsel for the United States.  If
7    the United States does not deliver written objections to Defendant within
8    forty-five (45) calendar days of receiving the proposed changes, the changes
9    may be implemented.  If the United States makes any objections to the
10   proposed changes within the forty-five (45)-day period, the specific changes
11   to which the United States objects shall not be implemented until the
12   objections are resolved pursuant to the process described in Paragraph 11.

## IV. TRAINING

13.  Defendant shall provide additional SCRA compliance training to any
employees who: (a) provide customer service to servicemembers in
connection with the servicing of motor vehicle loans, (b) have significant
involvement in servicing motor vehicle loans, including the ability to reduce
interest rates or terminate motor vehicle leases for servicemembers as
contemplated by the terms of the SCRA, or (c) have significant involvement
in repossessions of motor vehicles, (hereinafter together "covered
employees") within forty-five (45) calendar days after Defendant's training
program is approved by the United States or the Court pursuant to Paragraph
15.  Defendant shall provide to each covered employee: (a) training on the
terms of the SCRA specific to the employee's responsibilities associated with
that employee's position; (b) training on the terms of Defendant's SCRA
Policies and Procedures (both those required pursuant to Paragraph 9 and 10,
and all others adopted by Defendant) specific to the employee's

responsibilities associated with that employee's position; (c) training on the terms of this Order specific to the employee's responsibilities associated with that employee's position and his or her responsibilities and obligations under the SCRA; and (d) the contact information for the SCRA customer service representatives described in Paragraph 10(b).  Defendant shall also follow these training procedures for all of their employees who subsequently become covered employees within thirty (30) calendar days of their hiring, promotion or transfer.

14.  During the term of this Order, Defendant shall continue to provide annual SCRA training, with the same content as described in Paragraph 13, to covered employees with respect to their responsibilities and obligations under the SCRA, the SCRA Policies and Procedures and the terms of this Order.

15.  Within forty-five (45) calendar days of the United States' approval of the SCRA Policies and Procedures pursuant to Paragraphs 9 and 10, Defendant shall provide to the United States the curriculum, instructions, and any written material included in the training required by Paragraphs 13 and 14. These materials may incorporate SCRA compliance training offered on or before the effective date of this Order.  The United States shall have forty-five (45) calendar days from receipt of these documents to raise any objections to Defendant's training materials, and, if it raises any, the parties shall confer to resolve their differences.  In the event they are unable to do so, either party may bring the dispute to this Court for resolution.

16.  The covered employees may undergo the training required by Paragraphs 13 and 14 via live training, computer-based training, web-based training, or via interactive digital media.  If the training is conducted in any format other than live training, Defendant shall ensure that covered employees have the opportunity to have their questions answered by a company contact that

12

Defendant identifies as having SCRA expertise within two (2) business days of the training.  The training must require the covered employees to verify their participation.  If the training is conducted in any format other than live training, the training must require that covered employees demonstrate proficiency.  Any expenses associated with the training program required by Paragraphs 13 and 14 shall be borne by Defendant.

17.  Defendant shall certify in writing to counsel for the United States that covered employees successfully completed the training required by Paragraphs 13 and 14 and that said employees received the Consent Order and the SCRA Policies and Procedures specific to the employee's responsibilities associated with the loan being serviced.  Additionally, Defendant shall maintain a list of all covered employees who successfully completed the training required by Paragraphs 13 and 14.  For the duration of this Order, copies of this list shall be provided to the United States upon request.

## V.  COMPENSATION

18.  Defendant will deposit in an interest-bearing escrow account the sum of $4,130,000 to fund the compensation payments required by Paragraph 22.  Title to this account will be in the name of "Wells Fargo Bank, N.A. d/b/a Wells Fargo Dealer Services for the benefit of affected persons pursuant to Order of the Court in Civil Action No. [XXX]".  Defendant will provide written verification of the deposit to the United States within fifteen (15) calendar days of the effective date of this Order.  Any interest that accrues will become part of the Settlement Fund and be used and disposed of as set forth herein.  If the compensation payments required by Paragraph 22 total more than $4,130,000, Defendant will deposit into the escrow account all necessary additional funds to make payments before the deadlines established

by Paragraph 27.  Any taxes, costs, or other fees related to the escrow account shall be paid by Defendant.

19.  In the event Defendant determines that there are additional repossession accounts that were not in compliance with the SCRA, Defendant will undertake remedial compensation actions on those accounts while this Order is in effect and in a similar manner as outlined in this Order.

20.  The United States has determined that Defendant conducted 413 motor vehicle repossessions between January 1, 2008 and July 1, 2015 that were not in compliance with the SCRA; Defendant maintains that 31 of these were not violations of the SCRA, however Defendant has agreed to remediate these 31 repossessions in the interest of compromise.  The United States has previously provided the list of these repossessions to Defendant.

21.  Within thirty (30) calendar days of the effective date of this Order, Defendant shall provide to the United States an electronically searchable list of all its repossessions between July 2, 2015 and the effective date of this Order.  The United States shall run this list through the DMDC and undertake any independent investigation it deems appropriate to identify any additional repossessions that were not in compliance with the SCRA.  The United States shall provide Defendant with the list of additional repossessions that were not in compliance with SCRA within thirty (30) calendar days of receiving Defendant's complete repossession list.  In the event Defendant objects to the United States' list, Defendant shall be afforded thirty (30) calendar days to produce evidence of compliance to the United States.  After considering in good faith all evidence produced by Defendant, the United States shall make a final determination of the additional repossessions that were not in compliance with the SCRA within thirty (30) calendar day of Defendant's production of evidence.

14

22.     For each non-SCRA compliant repossession identified pursuant to Paragraphs 20 and 21, Defendant shall provide the following compensation:

   a.     an amount of $10,000;

   b.     any lost equity in the repossessed motor vehicle, as calculated by: subtracting any outstanding principal, interest, and other amounts owing by the borrowers (excluding any fees associated with repossession), plus any liens at the time of repossession and any disbursements made to the servicemember or a third party other than a lien holder from the proceeds of the repossession sale (exclusive of any fees associated with the repossession) from the retail value of the motor vehicle at the time of repossession as identified in the National Automobile Dealers Association ("NADA") Guide; and

   c.     interest accrued on this lost equity, calculated from the date of the repossession sale until the date payment is issued, at the rate set forth in 28 U.S.C. § 1961.

Defendant shall provide the United States with all records used to make the payment calculations described in this Paragraph for the United States' review and approval.

23.     The amounts described in Paragraph 22(a) shall be paid entirely to the servicemember-borrower on the note securing the motor vehicle. Defendant may require the servicemember-borrower to sign the Declaration at Exhibit B-1 and/or the Release at Exhibit B-2. Defendant may require any non-servicemember co-borrowers to sign the Release at Exhibit B-2. The amounts described in Paragraph 22(b) and (c) shall be distributed equally among all borrowers (including non-servicemember borrowers) on the title to the motor vehicle who sign the Declaration at Exhibit B-1, if required, and the Release at Exhibit B-2. In cases where Defendant has already taken

15

remedial actions with respect to a repossession identified pursuant to Paragraphs 20 and 21, the United States shall consider such remedial actions and adjust the compensation to be awarded.[11]

24. Within sixty (60) calendar days of the effective date of this Order, Defendant shall submit a plan ("Remediation Plan") to provide for the administration of borrower compensation. Pursuant to the Remediation Plan, Defendant shall conduct the activities set forth in Paragraphs 24-28. The terms of the Remediation Plan shall be subject to the non-objection of the United States. Defendant shall bear all costs and expenses of implementing the Remediation Plan. The Remediation Plan shall require Defendant to work cooperatively with the United States in the conduct of its activities, including reporting regularly to and providing all reasonably requested information to the United States.

25. Defendant, as part of its Remediation Plan, shall establish, and maintain throughout the contract period, cost-free means for affected servicemembers to contact it, including an electronic mail address, a website, and a toll-free telephone number.

26. For non-SCRA compliant repossessions identified pursuant to Paragraph 20, Defendant shall, to the extent it has not already, notify each identified servicemember by letter (using wording mutually agreeable to Defendant and the United States) within sixty (60) calendar days of the effective date of this Order. After the United States' determination, as provided in Paragraph 21,

---

[11] In determining the amount of compensation due to any servicemember or co-borrower pursuant to Paragraph 22, the United States will credit any monetary compensation or other remediation efforts, including returning the motor vehicle to the borrower, already provided to any servicemember or co-borrower for alleged compliance issues pursuant to Section 3952 of the SCRA and arising from the same motor vehicle loan.

16

Defendant shall notify each identified servicemember by letter (using wording mutually agreeable to Defendant and the United States) within forty-five (45) calendar days of the United States' determination.  For repossessions where money is due to a non-servicemember borrower pursuant to Paragraph 22, Defendant shall notify each identified non-servicemember borrower by letter (using wording mutually agreeable to Defendant and the United States) within fifteen (15) calendar days of receiving the Declaration, if required, and Release from the servicemember-borrower.  Defendant shall provide the United States with samples of all letters, and receive the United States' approval of the sample letters, before mailing any letter required by this Paragraph, and all letters mailed pursuant to this Paragraph shall be accompanied by the Declaration at Exhibit B-1, if required, and the Release at Exhibit B-2.  The Remediation Plan shall set forth effective methods to make contact with, and obtain a response from, each identified servicemember and non-servicemember borrower.

27. Defendant shall issue and mail compensation checks no later than twenty-one (21) calendar days after receipt of a signed declaration, if required, and release.  Defendant shall skip trace and redeliver any payment that is returned to Defendant as undeliverable, or that is not deposited or cashed within six (6) months.

28. Defendant shall for a period of two (2) years following the effective date of this Order provide the United States with a monthly accounting of all declarations, if required, and releases received, checks issued (including copies of issued checks), and notifications without responses or that were returned as undeliverable.  Defendant shall report any uncashed checks in accordance with state unclaimed property laws.

29.     Any money not distributed from the escrow account, including accrued
        interest, within two (2) years of the date the initial notifications are sent to
        persons eligible for the compensation payments required by Paragraph 22
        will be distributed to one or more charitable organizations that assist
        servicemembers.  Recipient(s) of such funds must not be related to
        Defendant.  Before selecting the organization(s), Defendant will obtain a
        proposal from the organization(s) on how the funds will be used consistent
        with furthering the goals of the SCRA, submit such proposal to the United
        States, and consult with and obtain the non-objection of the United States.
        The United States and Defendant may request modification of the proposal
        before approving the organization(s).  The parties will thereafter seek
        approval from the Court to distribute the remaining funds to the qualified
        organization(s).  Defendant will require each recipient to submit to Defendant
        and the United States a detailed report on how funds are utilized within one
        (1) year after the funds are distributed, and every year thereafter until the
        funds are exhausted.

30.     Defendant will be entitled to a set-off, or any other reduction, of the amount
        of compensation payments required by Paragraph 22 because of any debts
        owed by the recipient, only in the calculation of lost equity as provided by
        Paragraph 22(b).  Defendant also will make payments notwithstanding any
        release of legal claims, arbitration agreement, or loan modification previously
        signed by any such recipient.

31.     In the event that the United States has reason to believe that Defendant is not
        materially complying with the terms of the Remediation Plan, Defendant
        shall present for review and determination of non-objection a course of action
        to effectuate material compliance with the Remediation Plan.  The United
        States shall make a determination of non-objection to the course of action or

direct Defendant to revise it. In the event that the United States directs revisions, Defendant shall make the revisions and resubmit the course of action to the United States within thirty (30) days. Upon notification that the United States has made a determination of non-objection, Defendant shall implement the course of action. If the parties cannot resolve differences with regard to the revised course of action after good faith efforts to do so, either party may bring the dispute to this Court for resolution. No individual may obtain review by the Court or the parties of the identifications made, and payments disbursed, pursuant to Paragraphs 20-28.

## VI. OTHER RELIEF

32. Concurrent with providing financial compensation to the servicemember-borrower, Defendant must request that all three (3) major credit bureaus delete trade lines for accounts belonging to the servicemember(s) and any co-borrower(s) attributable specifically to the wrongful repossessions. Further, Defendant shall abandon, and must indemnify the servicemember and his or her co-borrower(s) against any third-party's pursuing, any claim for deficiency that was remaining on the SCRA-protected loan after a repossession, where the repossession was allegedly completed in violation of the SCRA by Defendant.

33. Every quarter for a period of two (2) years following the effective date of this Order, Defendant shall provide the United States with an accounting of all credit entries repaired.

## VII. CIVIL PENALTY

34. Within thirty (30) calendar days of the effective date of this Order, Defendant shall pay a total of Sixty Thousand Dollars ($60,000) to the United States Treasury as a civil penalty pursuant to 50 U.S.C. § 4041(b)(3) and 28 C.F.R. 85.3(b)(4), to vindicate the public interest. The payment shall be in the form

of an electronic funds transfer pursuant to written instructions to be provided by the United States.

## VIII. ADDITIONAL REPORTING AND RECORD-KEEPING REQUIREMENTS

35. For the duration of this Order, Defendant shall retain all records relating to its obligations hereunder, including its records with respect to all loans for which a servicemember has sought SCRA relief, whether that relief was granted by Defendant, all records involving repossessions, and all records relating to compliance activities as set forth herein. The United States shall have the right to review and copy any such records, including electronic data, upon reasonable request during the term of this Order.

36. During the term of this Order, Defendant shall notify counsel for the United States in writing every six (6) months of receipt of any SCRA or military-related complaint by the motor vehicle lending line of business. Defendant shall provide a copy of any written complaints with the notifications. Defendant will incorporate into its SCRA Policies and Procedures a requirement that all customer service personnel, upon receiving any oral SCRA complaint, shall notify individuals designated and trained to receive SCRA complaints pursuant to Paragraph 10(b). Whether regarding a written or oral SCRA complaint, the notification to the United States shall include the full details of the complaint, including the complainant's name, address, and telephone number, and the full details of all actions Defendant took to resolve the complaint. Defendant shall also promptly provide the United States all information it may request concerning any such complaint. If the United States raises any objections to Defendant's actions, the parties shall meet and confer to consider appropriate steps to address the concerns raised by the United States' review. If the parties are unable to come to an

agreement regarding such objections or concerns, either party may bring the dispute to this Court for resolution.

## IX. SCOPE OF CONSENT ORDER

37. The provisions of this Order shall apply to Defendant, its parent Wells Fargo & Company, and any of their subsidiaries, predecessors, acquired companies, or successor entities.  It shall also apply to the officers, employees, agents, representatives, assigns, successors-in-interest, and all persons and entities in active concert or participation with all of those entities, including with respect to any loans they acquired from January 1, 2008 to the effective date of this Order.

38. In the event that Defendant is acquired by or merges with another entity, Defendant shall, as a condition of such acquisition or merger, obtain the written agreement of the acquiring or surviving entity to be bound by any obligations remaining under this Order for the remaining term of this Order.

39. This Order does not release claims for practices not addressed in the Complaint's allegations, and it does not resolve and release claims other than those under Section 3952(a) of the SCRA.  This Order does not release any claims that may be held or are currently under investigation by any federal agency, or any claims that may be pursued for actions that may be taken by any executive agency established by 12 U.S.C. § 5491 or the appropriate Federal Banking Agency (FBA), as defined in 12 U.S.C. § 1813(q), against Defendant, Wells Fargo & Company, any of their affiliated entities, and/or any their institution-affiliated parties, as defined by 12 U.S.C. § 1818 or any other statute or regulation.

40. Nothing in this Order will excuse Defendant's compliance with any currently or subsequently effective provision of law or order of a regulator with authority over Defendant that imposes additional obligations on it.

41. The parties agree that, as of the effective date of this Order, litigation is not "reasonably foreseeable" concerning the matters described above. To the extent that either party previously implemented a litigation hold to preserve documents, electronically stored information (ESI), or things related to the matters described above, the party is no longer required to maintain such litigation hold. Nothing in this Paragraph relieves either party of any other obligations imposed by this Order.

## X. MODIFICATIONS, ATTORNEY'S FEES AND COSTS, AND REMEDIES FOR NON-COMPLIANCE

42. Any time limits for performance imposed by this Order may be extended by the mutual written agreement of the parties.

43. The parties shall be responsible for their own attorney's fees and court costs, except as provided for in Paragraph 45.

44. The parties shall endeavor in good faith to resolve informally any differences regarding the interpretation of and compliance with this Order prior to bringing such matters to the Court for resolution. However, in the event the United States contends that there has been a failure by Defendant, whether willful or otherwise, to perform in a timely manner any act required by this Order or otherwise comply with any provision thereof, the United States may move the Court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring the performance of such act or deeming such act to have been performed, and an award of any damages, costs, and attorney's fees which may have been occasioned by Defendant's violation or failure to perform.

## XI. RETENTION OF JURISDICTION

45. As described in Paragraph 4, for the past two and one-half years, Defendant has been engaged in large-scale voluntary SCRA compliance efforts. This

22

1    Order shall be in effect for an additional period of two and one-half years

2    from its date of entry.  The Court shall retain jurisdiction for the duration of

3    this Order to enforce its terms, after which time this case shall be dismissed

4    with prejudice.  The United States may move the Court to extend the duration

5    of this Order in the interests of justice.

6

7    SO ORDERED, this ___ day of _____, 2016.

8

9

10                              _____

11                              UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The undersigned hereby apply for and consent to the entry of the Order:

For the United States of America:

EILEEN M. DECKER                          LORETTA E. LYNCH
United States Attorney                     Attorney General

DOROTHY A. SCHOUTEN                        VANITA GUPTA
Assistant United States Attorney           Principal Deputy
Chief, Civil Division                      Assistant Attorney General
                                           Civil Rights Division


/s/ *Joanna Hull*                          /s/ *Sameena Shina Majeed*
JOANNA HULL                                SAMEENA SHINA MAJEED
Assistant United States Attorney           Chief, Housing and Civil Enforcement
Chief, Civil Rights Section                Section

                                           /s/ *Elizabeth A. Singer*
                                           ELIZABETH A. SINGER
                                           Director, U.S. Attorneys' Fair Housing
                                           Program

                                           /s/ *Daniel P. Mosteller*
                                           NICOLE M. SIEGEL
                                           DANIEL P. MOSTELLER
                                           Trial Attorneys

1  For Defendant Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services:

2

3  */s/ Erin J. Illman*

4  ERIN J. ILLMAN (CA No. 238262)
   BRADLEY ARANT BOULT CUMMINGS LLP

5  214 N. Tyron Street, Suite 3700
   Charlotte, NC 28202

6  Phone: (704) 338-6123

7  Fax: (704) 332-8858
   eillman@bradley.com

8

9  ROBERT R. MADDOX
   KEITH S. ANDERSON

10  ALISON C. SMITH

11  BRADLEY ARANT BOULT CUMMINGS LLP
   One Federal Place

12  1819 Fifth Avenue North

13  Birmingham, AL 35203
   Phone: (205) 521-8000

14  Fax: (205) 521-8800

15  rmaddox@bradley.com
   kanderson@bradley.com

16  acsmith@bradley.com

17

18

19

20

21

22

23

24

25

26

27

28

The undersigned hereby apply for and consent to the entry of the Order:

For the United States of America:

| | |
|---|---|
| EILEEN M. DECKER<br>United States Attorney | LORETTA E. LYNCH<br>Attorney General |
| DOROTHY A. SCHOUTEN<br>Assistant United States Attorney<br>Chief, Civil Division | VANITA GUPTA<br>Principal Deputy<br>Assistant Attorney General<br>Civil Rights Division |

*/s/ Joanna Hull*
JOANNA HULL
Assistant United States Attorney
Chief, Civil Rights Section

SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement
Section

ELIZABETH A. SINGER
Director, U.S. Attorneys' Fair Housing
Program

NICOLE M. SIEGEL
DANIEL P. MOSTELLER
Trial Attorneys

24

1    For Defendant Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services:

2

3    _____

4    ERIN J. ILLMAN (CA No. 238262)
     BRADLEY ARANT BOULT CUMMINGS LLP
5    214 N. Tyron Street, Suite 3700
     Charlotte, NC 28202
6    Phone: (704) 338-6123
7    Fax: (704) 332-8858
     eillman@bradley.com
8

9    ROBERT R. MADDOX
10   KEITH S. ANDERSON
     ALISON C. SMITH
11   BRADLEY ARANT BOULT CUMMINGS LLP
     One Federal Place
12   1819 Fifth Avenue North
13   Birmingham, AL 35203
     Phone: (205) 521-8000
14   Fax: (205) 521-8800
15   rmaddox@bradley.com
     kanderson@bradley.com
16   acsmith@bradley.com

17

18

19

20

21

22

23

24

25

26

27

28
                                    25

# EXHIBIT A

**IMPORTANT NOTICE AFFECTING MILITARY SERVICEMEMBERS**

**RIGHTS AND PROTECTIONS AFFORDED UNDER THE SERVICEMEMBERS**

**CIVIL RELIEF ACT**

Attached to this notice you will find a waiver of rights and protections that may be applicable to you and your dependents pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. § 3901, et seq. (the "SCRA"). The SCRA provides military personnel and their dependents with a wide range of legal and financial protections. Among other benefits and protections, the SCRA:

- Prohibits the repossession of a servicemember's motor vehicle without a court order, as long as a deposit or at least one installment payment was made while the borrower was not in military service.

- Upon notice by the servicemember, imposes a 6% maximum rate of interest that may be charged during military service on loans incurred before the servicemember began his or her current military service.

- Postpones court actions against servicemembers under certain circumstances. If you choose to sign the attached waiver, Wells Fargo will have the option to proceed with a repossession of your motor vehicle without the protections of the SCRA. If you do not sign this waiver, Wells Fargo will be required to obtain a court order to repossess if you took out your loan and made a down payment on the motor vehicle, or at least one payment on the loan, when you were not in military service. You may be able to seek a postponement of the repossession. Additionally, if Wells Fargo takes you to court to

26

repossess your motor vehicle, the court may take steps to ensure that a judgment is not entered against you if you are unable to appear.

**Before waiving these important statutory rights, you should consult an attorney regarding how best to exercise your rights or whether it is in your interest to waive these rights under the conditions offered by Wells Fargo.**

**For More Information:**

- CONSULT AN ATTORNEY: To fully understand your rights under the law, and before waiving your rights, you should consult an attorney.

- JAG / LEGAL ASSISTANCE: Servicemembers and their dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. A military legal assistance office locator for all branches of the Armed Forces is available at http://legalassistance.law.af.mil/content/locator.php.

- MILITARY ONESOURCE: "Military OneSource" is the U.S. Department of Defense's information resource. Go to http://www.militaryonesource.com.

27

## **EXHIBIT B-1**

### **DECLARATION**

I, [INSERT NAME], do hereby declare and state as follows:

1. I owned a vehicle obtained through a loan with Wells Fargo, Loan Number [LOAN NUMBER] that was repossessed.

2. I obtained the loan on or about [LOAN FUNDING DATE].

3. On or about [REPOSSESSION DATE], I WAS either:

   i.   on a covered period of military service; OR

   ii.  a member of a reserve component (Reserves or National Guard) and had received orders to report for a covered period of military service.

4. Please consider the following additional information in support of this Declaration:

   _____

   _____

   _____

   _____

   _____

I confirm that the foregoing is true and correct.

Executed this _____ day of _____, 20__.

SIGNATURE: _____

PRINT NAME: _____

28

# **APPENDIX REGARDING MILITARY SERVICE**

As used in this Declaration, a "covered period of military service" is any of the following:

a) Full-time active duty with the armed forces of the United States (Army, Navy, Air Force, Marine Corps, or Coast Guard);

b) A period of active service with the National Guard: i) authorized by the President or the Secretary of Defense; ii) longer than thirty (30) consecutive days; iii) under orders issued under Section 502(f) of Title 32 of the United States Code; and iv) for the purpose of responding to a national emergency declared by the President and supported by federal funds;

c) Active service as a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration; or

d) A period of time during which I was a servicemember absent from duty on account of sickness, wounds, leave, or other lawful cause.

If you have any additional questions about whether your service constitutes a "covered period of military service" for purposes of this declaration, please contact the Department of Justice at 202-514-4713 and reference the Wells Fargo SCRA motor vehicle case.

## EXHIBIT B-2

### SETTLEMENT AND GENERAL RELEASE AGREEMENT

In consideration for Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services' payment to me of $[AMOUNT], I, [BORROWER'S NAME], hereby release and forever discharge all claims, arising prior to the date of this Agreement, related to alleged violations of Section 3952(a) of the Servicemembers Civil Relief Act in the repossession and sale of a [VEHICLE; VIN_____] that I may have against Wells Fargo and all related entities, parents, predecessors, successors, subsidiaries, and affiliates and all of its past and present directors, officers, agents, managers, supervisors, shareholders, and employees and its heirs, executors, administrators, successors or assigns.

The parties represent and warrant to each other, that the parties specifically understand and agree that the parties' settlement and compromise claims and disputes regarding the retail installment contract and the vehicle is a compromise of disputed claims and that the existence of this Agreement or any payment made hereunder shall not be construed as an admission of liability of the allegations, claims or contentions of any party, and that there are no covenants, promises, undertakings or understanding between the parties outside of this Agreement except as specifically set forth herein.

Executed this _____ day of _____, 20____.

SIGNATURE: _____

PRINT NAME: _____

30

# EXHIBIT E

Exclusive - Wells Fargo planned to eventually tell public about auto insurance problems:...

Discover Thomson Reuters

Directory of sites    Login    Contact    Support

shine on StanChart

eventually tell public about auto

  

PICK-POCKET PROOF PANTS®
43 STOPPED SO FAR... THAT WE KNOW ABOUT

CLOTHING ARTS

#NEWS

JULY 28, 2017 / 2:41 PM / 5 DAYS AGO

# Exclusive - Wells Fargo planned to eventually tell public about auto insurance problems: executive

Dan Freed

3 MIN READ                                          🐦  f

THE WIRE

TRENDING

Equities weaken after Dow breaks 22,000; dollar soft
2 HOURS AGO

German carmakers in emissions deal to try to avert diesel bans
5 MINUTES AGO

Algeria resumes repatriations to Niger amid migration row
21 MINUTES AGO

FILE PHOTO: A Wells Fargo branch is seen in the Chicago suburb of Evanston, Illinois, U.S. on February 10, 2015.    Jim Young/File Photo

Exclusive: Wells Fargo planned to eventually tell public about auto insurance problems - page 4

NEW YORK (Reuters) - Wells Fargo & Co (WFC.N) began examining the way its auto lending unit enrolled borrowers into insurance policies a year ago, but did not plan to disclose problems it uncovered until it was ready to issue reimbursements to affected customers, its head of consumer lending told Reuters on Friday.

In an interview, Franklin Codel said the business started noticing elevated customer complaint volumes in July 2016. It quickly suspended its auto collateral protection insurance (CPI) program and escalated issues to senior management, the board and regulators, he said.

"The problem with disclosing to the marketplace today or several months ago is customers start calling and asking when they're going to get their money," he said.

Wells, the third-largest U.S. bank, has been embroiled in a scandal since last September in which thousands of branch employees created as many as 2.1 million phony deposit and credit-card accounts in customers' names without their permission over a period of several years.

The bank has faced questions from investors over whether its disclosures about sales abuses were timely or adequate, and whether problems extended beyond its retail bank.

Since that time, lawmakers have released information suggesting small business and brokerage customers may have had phantom accounts opened in their names, and Prudential Financial Inc (PRU.N) cut ties with Wells over accusations that bankers were improperly enrolling customers in its insurance policies without their knowledge.

On Thursday evening, the New York Times revealed that 800,000 of Wells Fargo's auto borrowers were charged for insurance they did not need, prompting the bank to issue a press release detailing its remediation efforts.

Wells plans to return $80 million to 570,000 customers who were wrongly charged.

Its auto lending business has been going through an overhaul this year to better manage risk and install new leadership. Dawn Martin Harp, who

shine on StanChart

EU declines to recognise Venezuela election but shies away from sanctions
24 MINUTES AGO

EU's Juncker says ready to retaliate if needed over new U.S. sanctions on Russia
25 MINUTES AGO

ADVERTISEMENT



Set Your Sights High.
Open a Premier High Yield Savings Account
1.30% APY on balances up to $100k + $100 cash bonus*
GET STARTED
Enter promo code: PREMIER
CiT Bank
*See site for bonus details.    Member FDIC

SPONSORED


Introducing the S&P 500 Quality, Value & Momentum MultiFactor Index
S&P Dow Jones Indices


See How Some Retirees Use Options Trading As A Safe Way To Earn Income
TradeWins


Mark Cuban: We're About to Meet the World's First Trillionaire
The Motley Fool


Warning for Investors: Powerful tool predicts date the US will fall.
Money and Markets

eventually tell public about auto

headed the auto lending business during the sales abuses, retired in April
and her deputy, Bill Katafias, also departed.

"Both of those executives, in my view, were held accountable for their
actions," Codel said, including "from a compensation perspective."

Katafias did not return a call to his office and Martin Harp could not be
reached.

Wells Fargo shares fell 2.6 percent to $53.31 on Friday afternoon.
Although the stock has recovered from a sharp decline last year, analysts
have said ongoing fallout from the sales scandal has dampened
performance.

In a statement on Friday, New York City Comptroller Scott Stringer, who
controls funds that hold Wells Fargo stock, demanded better disclosures
about the auto insurance problems and called for a new independent
chairman of the board.

The board "needs to be overhauled - now," Stringer said.

Reporting by Dan Freed in New York; Additional reporting by Ross Kerber in
Boston; Writing by Lauren Tara LaCapra; Editing by Bernard Orr

shine on StanChart

SPONSORED

Biotech stock explodes after drug
announcement
Invictusnews.com

Labeled green bond issuances could reach up
to USD 200 billion in 2017
S&P Dow Jones Indices

Motley Fool Gives Rare "Total Conviction" Buy
Sign
The Motley Fool

Bitcoin Investors Have ENVV On Their Must
Watch Lists
ROI Marketplace

Expert predicts exact date America will fall.
Money and Markets

Apps   Newsletters   Reuters Plus   Advertising Guidelines   Cookies
Terms of Use   Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.
© 2017 Reuters. All Rights Reserved.

Exclusive: Wells Fargo plans to eventually refund auto insurance problems...



# EXHIBIT F

WELLS FARGO

# Wells Fargo May Have Charged 500,000 Clients for Unwanted Insurance

Bloomberg
Jul 28, 2017



Wells Fargo & Co.'s disclosure that it may have pushed thousands of car buyers into loan defaults and repossessions by charging them for unwanted insurance is raising doubts about the bank's ability to put proper controls in place.

"The steady drip of revelations is concerning as it makes quantifying and qualifying the extent of the internal control failures difficult," Isaac Boltansky, an analyst at Compass Point Research & Trading, said Friday in an email. "Which is worrisome for both Washington and Wall Street."

An internal review of the bank's auto lending found more than 500,000 clients may have unwittingly paid for protection against vehicle loss or damage while making monthly loan payments, even though many drivers already had their own policies, Wells Fargo said in a statement late Thursday. The firm said it may pay as much as $80 million to affected clients -- with extra money for as many as 20,000 who lost cars, "as an expression of our regret."

The revelation threatens to undermine the bank's 10-month effort to restore its image after authorities announced last year that branch workers may have opened millions of unauthorized accounts for customers. For shareholders, Thursday's disclosure also landed without any warning, even after that earlier debacle sent the stock tumbling and prompted congressional hearings and a leadership shakeup.

## 'Clearly Insufficient'

"What has been shown is that the bank was run for superior revenue growth, and the controls around managing that were clearly insufficient," Atlantic Equities

analyst Christopher Wheeler said in an email. "Management changes may have to be more extensive to try and shake off the new and lower-quality reputation."

Wells Fargo shares fell 2.5 percent to $53.37 at 12:09 p.m. in New York, the worst performance in the KBW Bank Index. The stock has dropped 3.1 percent this year, compared with the 3.9 percent advance of the 24-company index.

The San Francisco-based lender said it began reviewing the insurance issue about 12 months ago after hearing from clients.

"Upon our discovery, we acted swiftly to discontinue the program and immediately develop a plan to make impacted customers whole," Franklin Codel, the bank's head of consumer lending, said in the statement. The bank's leaders "are extremely sorry for any harm this caused our customers, who expect and deserve better from us," he said.

Kevin J. Barker, a Piper Jaffray & Co. analyst, questioned why Wells Fargo waited until now to release details. He said lawsuits could cost the bank "multiples more" than the $80 million disclosed Thursday and further harm its relationship with some customers.

## 'Collateral Damage'

"Why didn't the company address these issues publicly while they were already dealing with the account scandal?" Barker wrote Friday in a note to investors. "What other collateral damage may have been caused by the repossession of these cars on peoples' lives?"

The bank notified its main regulator, the Office of the Comptroller of the Currency, "very promptly" after receiving a number of customer complaints in July of 2016, Codel said Friday in a phone interview, without giving a specific date. It also notified the Federal Reserve and the Consumer Financial Protection Bureau around the same time, he said.

"They were aware early on, and we've had regular conversations with them as we both made business decisions and started working on the remediation," Codel said.

Bryan Hubbard, an OCC spokesman, said the agency can't comment "on ongoing supervisory matters" at a bank it regulates or "potential pending actions."

An examination of the program found that an external vendor didn't adequately ensure customers weren't charged for the coverage if they already had their own policies, according to the bank's statement. The bank's program for collateral protectioninsurance insurance, or CPI, was scrapped in September.

## Other Victims

One group of about 490,000 customers unnecessarily paid for CPI for at least some period, the bank said. Collectively, they will receive about $25 million in refunds.

Wells Fargo also described two smaller groups of victims where the impact on individuals may have been more severe:

About 60,000 clients lived in five states that don't allow CPI to be imposed on borrowers without a specific notification, which the bank said they didn't receive. That group will get $39 million. An estimated 20,000 customers may have had cars repossessed because the additional costs from CPI, the bank said. It expects to spend $16 million on that group, compensating them for their vehicles. The amounts "will depend on each customer's situation and also will include payment above and beyond the actual financial harm as an expression of our regret for the situation," Wells Fargo said.

The bank announced the measures a few hours after New York Times columnist and editor Gretchen Morgenson said she had obtained a 60-page report by consulting firm Oliver Wyman examining how CPI was imposed on customers of the bank's Dealer Services unit. The document shows Wells Fargo stopped sharing in commissions from the insurance sales in February 2013, she wrote.

# Refunds Coming

Catherine Pulley, a Wells Fargo spokeswoman, declined to provide a copy of the consultant's report. The report, commissioned to help the lender decide how to respond to its customers, was completed in February, according to a person with knowledge of the matter, who asked not to be identified discussing internal affairs.

Wells Fargo reviewed policies placed from 2012 to 2017, according to its statement. The company will start sending letters and refund checks to customers next month, and expects the process will be complete by the end of the year. The lender also promised to work with credit bureaus to amend customers' records.

The bank has been trying to move past the account scandal that erupted publicly in September when it paid $185 million in fines. In that case, Wells Fargo initially faulted low-level staff, saying it had fired more than 5,300 employees over five years as it sought to stamp out their abuses. That backfired as workers came forward, saying they faced intense pressure to meet unrealistic quotas.

The bank struck a different tone Thursday.

"We take full responsibility for our failure to appropriately manage the CPI program," Codel said in the statement. The bank has publicly promised that it will do better, he said. "Our actions over the past year show we are acting on this commitment."

# EXHIBIT G

About Us | Advertise | Center for Auto Finance Excellence | Consulting | Magazine Archive

**Autofinance news**



REGISTER NOW — AUTO FINANCE 17 SUMMIT
OCTOBER 25-27 • THE WYNN LAS VEGAS

Home | News » | Data » | Directory | Events » | Subscribe » | Jobs | Search

# Dawn Martin Harp to Retire as President of Wells Fargo Dealer Services

JANUARY 11, 2017
BY WILLIAM HOFFMAN
WHOFFMAN @
ROYALMEDIA.COM

SMALL SEARCH

Search          Search

**Subscribe to our mailing list**

email address

Subscribe



Dawn Martin Harp, president of Wells Fargo Dealer Services, is set to retire in April.

After 20 years with Wells Fargo Dealer Services, including six as president, Dawn Martin Harp will retire from the position on April 1, according to a company press release.

The company will look internally and externally for a replacement to head up one of the top five auto financiers in the U.S.

When Martin Harp, 57, first inhabited the position in 2011, she set out to strengthen the company's dealer relationships for both commercial and consumer lending a company statement noted.

"Under Dawn's leadership, Wells Fargo continued to build our market leadership position in the auto finance business," Franklin Codel, head of Wells Fargo Consumer Lending, said in the statement. "She moved our business forward to where we now work with more than 14,000 auto dealers, helping more than 3.7 million customers finance affordable vehicle transportation."

Since taking the position, Martin Harp has grown Wells Fargo Dealer Service's total outstandings from $44.6 billion in 2011 to $60 billion in 2015, according to Big Wheels Auto Finance data.

Wells Fargo Dealer Services originated the most auto loans of any company through September, according to Experian and CU Direct. However, the 2015 Big Wheels Report placed the company at fifth in total outstandings and the latest third quarter earnings showed a 2% drop in origination volume compared to the same period a year prior.

Her retirement comes after an investigation announced in September 2016, through which the DOJ and Comptroller of the Currency gathered Wells data from 2008 to 2015, resulting in a $24 million consent order. The settlement included $4.1 million that will serve as $10,000 payments to the 413 affected servicemembers.

There was also the separate faked accounts scandal that shook the company's core banking business in a $185 million settlement and caused former CEO John Stumpf to step down. *Auto Finance News* found little connection between the accounts scandal and Wells Fargo's auto business.

Before becoming president, Martin Harp served as Wells Fargo Dealer Services chief operating officer. Prior to joining the company she was chief information officer and the director of network computing at WFS Financial. She is a member of the board for the American Financial Services Association as well as a member of its auto finance committee and women's leadership council. Martin Harp is also a member of Wells Fargo's Consumer Lending Group Diversity and Inclusion leadership committee, the statement said.

"One of Dawn's greatest legacies at Wells Fargo will be her commitment to diversity and local communities," Codel said. "She is a champion for developing diverse talent and identifying future leaders across the industry and in Wells Fargo. We will miss her and congratulate her on a great career that impacted customers, team members, and the communities we serve."

6 - Readers Like This Post

Tags: Wells Fargo, Wells Fargo Dealer Services



Time for a change?



EQUIFAX
Join us for a Free Webinar
**Every Deal Counts**
August 1, 2017 @ 11:00 AM EDT
Learn 4 steps you can take to make every lending deal count in a down market.
Register Now

LATEST TWEETS

5 tips to lower #mobile #app bounce rates. Full story: https://t.co/0t1KEpqTIH @UQuoteHQ @HonckerCars @PwC_LLP via... https://t.co/3bfCyWe7Q0
26 MINS AGO

.@BellcoFCU monitors #residuals as used-vehicl values decline. Full story: https://t.co/glzyP40zZ #usedcars... https://t.co/5hUlrtWvjT
2 HOURS AGO

Santander Makes Unexpected Subprime Gains a Competitors Pullback - https://t.co/FiZAyHMJev https://t.co/elwnKSFldT
4 HOURS AGO

Follow @autofinancenews

## 5 Comments

Pingback: *Wells Fargo 4Q Auto Originations Decline 15% YoY | Auto Finance News*

Pingback: *Wells Fargo 'Holding Fast' on Shorter Loan Terms Despite Volume Loss, CFO Says | Auto Finance News*

Pingback: *Executive VP Bill Katafias Leaves Wells Fargo | Auto Finance News*

Pingback: *Wells Fargo Promotes Laura Schupbach to Head of Dealer Services | Auto Finance News*

Pingback: *Former Wells Fargo Executive Named CEO of CRB Auto | Auto Finance News*

## Leave a Reply

You must be logged in to post a comment.

### MORE IN OPERATIONS



**GM Financial Preps for Lease Slowdown Amid Declining Values**

JULY 28, 2017



**Westlake Exec Returns to Manage Losses, Delinquencies**

JULY 27, 2017



**Royal Credit Union Promotes Brandon Riechers to CEO**

JULY 27, 2017

**AFN PORTFOLIO**

| Syml | Lst Val | +/- Val | +/- % |
|------|---------|---------|-------|
| ALLY | 22.655  | -0.005  | -0.022% |
| CPSS | 4       | -0.17   | -4.08%  |
| CACC | 249.505 | +0.645  | +0.259% |
| SC   | 13.02   | -0.44   | -3.27%  |
| NICK | 8.61    | +0.11   | +1.29%  |
| MLES | 0.01    | +0.00   | +0.00%  |
| CFN  | 60      | +0.00   | +0.00%  |
| AUTCF | 34     | +0.00   | +0.00%  |
| IX   | 79.241  | +0.021  | +0.027% |

**EVENTS**



**CHARITY**

Auto Finance News concentrates its charitable giving on Airlink, a not-for-profit organization that provides disaster transportation logistics to global NGOs. Learn more about Airlink at airlinkflight.org.

**ARCHIVES**

Archives
Select Month

**NEWS TIP**

Got a news tip? Share it with us via editorial@royalmedia.com

©2017 ROYALMEDIA & AUTO FINANCE NE